STATE OF NORTH CAROLINA v. JERRY DOUGLAS WATKINS

No. 3

(Filed 14 March 1973)

1. Criminal Law § 23; Homicide § 13— first degree murder — guilty plea

Though there is no statute in this State specifically prohibiting a court from accepting a plea of guilty of a capital crime, the long-established practice of the judiciary not to accept such a plea has become the public policy of the State, and—until the legislature changes that policy—the Court cannot accept a plea of guilty of a capital crime.

2. Homicide § 31— first degree murder — guilty plea — jury determination of sentence — error

The trial court in a first degree murder prosecution erred in submitting the case to the jury upon the issue of punishment alone after defendant entered a plea of guilty to the charge since G.S. 14-17 under which defendant was charged allowed the jury's discretion as to life imprisonment or death to be exercised only in connection with its verdict upon the issues of guilt or innocence of the accused; however, the error did not require that the sentence of life imprisonment given defendant be set aside.

3. Criminal Law § 135; Homicide § 31— first degree murder — sentence of life imprisonment only

Defendant's contention in a first degree murder case that his plea was void because it was a plea of guilty to a capital crime was incorrect since, according to *Furman v. Georgia*, the only permissible punishment for murder in the first degree at the time of defendant's plea was life imprisonment; however, had the homicide occurred after 18 January 1973, the date of *State v. Waddell*, the contention would have had to be sustained.

State v. Watkins

APPEAL by defendant under G.S. 7A-27 (a) from *Braswell, J.,* 12 June 1972 Session of WAKE.

Defendant was arrested on 26 October 1970 upon a warrant charging him with the murder of his wife, Margie Watkins, on 25 October 1970. At the 16 November 1970 Session of Wake, in the form prescribed by G.S. 15-144 (1965), he was indicted for the murder.

On the day defendant was arrested Alfonso Lloyd, Esquire, an attorney of the Wake County Bar, was appointed to represent him. Thereafter a preliminary hearing was waived and defendant bound over to the Superior Court for trial. Upon Mr. Lloyd's affidavit suggesting that defendant might be "mentally deranged," the court committed defendant to the State Hospital at Raleigh for observation pursuant to G.S. 122-91 (1964).

On 10 December 1970, the director of the Forensic Unit of the hospital reported to the court that defendant was not insane; that examination, observation, and testing revealed no evidence of insanity or any other mental disturbance which might interfere with defendant's ability to plead to the bill of indictment; that Watkins fully understood the true nature and possible consequence of his criminal charges and was able to assist in his defense; that defendant "should be returned to the court inasmuch [as] he is competent to stand trial."

During defendant's stay at the State's hospital, because of Mr. Lloyd's illness, Sheldon Fogel, Esquire, was substituted as defendant's counsel. When defendant refused to discuss the defense of his case with him, Mr. Fogel was permitted to withdraw as counsel and, upon defendant's affidavit of indigency, William W. Merriman III, Esquire, was appointed to represent him.

Defendant was brought to trial on 12 June 1972. He was formally arraigned in the manner customary in capital cases, entered a plea of not guilty of the crime charged in the indictment, and a jury was duly selected and impaneled to try the issue.

The background of this homicide emerges from the testimony of defendant's mother-in-law, Mrs. Watson Price, who testified for the State, and that of defendant himself. For con-

State v. Watkins

tinuity of exposition, their "background evidence" is summarized in the first two paragraphs below.

Defendant testified that he married when he was 19 and his wife was 16. On 25 October 1970 they had been married about ten years. Until he went to prison in 1969 for breaking and entering they had lived together. After having visited him regularly in prison, his wife had stopped coming in November 1969. From then until 25 October 1970 he had neither seen her nor talked to her on the telephone. Mrs. Price testified that about a year prior to the homicide she had changed her telephone number after defendant had called to tell her he was going to kill his wife if "they" didn't kill him first. Mrs. Price told him Margie had quit her job and left town, and she did not know where Margie was.

Defendant testified that in November 1969 he escaped from prison and, after searching unsuccessfully for his wife for three days, he went to Florida. On 25 October 1970 defendant was back in prison and in honor grade. He had been going to his mother's home every weekend for a couple of months. He had served his minimum sentence but had been turned down three times for parole. He testified he "thought his wife was writing the prison department to keep [him] in there," and he had asked her for a divorce thinking he "might get out" in that way. However, he denied that he was mad with his wife on 25 October 1970 and that he knew Mrs. Price had had her telephone number changed.

Prior to resting its case the State offered evidence, which tended to show:

On 25 October 1970 defendant's wife, Margie, was living with her parents, Mr. and Mrs. Watson Price. At approximately 9:30 p.m. defendant "pulled the front door open" and, pistol in hand, walked into the living room where Mrs. Price and Margie were sitting. He said to Margie, "I've come to blow your goddamn brains out just like I told you I was going to do." With that he shot her, turned and shot Mrs. Price, and then shot Margie again. After pulling Margie out of the chair, defendant dragged her around by her hair and "kicked her until she was worked all the way across the room." At one point he pulled out a whole handful of her hair and threw it on the floor. When he had stopped kicking his wife he said to Mrs. Price, "I am going to blow your goddamn brains out because you had your tele-

phone number changed." Upon hearing this Margie sat on the floor and begged him not to kill her mother. Defendant then shot Margie in the head twice. When she "fell over dead," defendant turned and shot Mrs. Price again. In all, he shot his wife four times and Mrs. Price three times.

When defendant arrived Mr. Price was sleeping in a bedroom adjoining the living room. Price "was awakened by a terrible noise in the house, shooting and hollering and screaming." As he started into the living room defendant turned the gun on him and he slammed the door shut. Defendant "tried his dead-level best" to get into the bedroom, all the while threatening to kill Mr. Price. At one time he shot into the room. However, "in less than five minutes," defendant gave up trying to get in, and Mr. Price dialed the telephone operator and asked her to send officers and ambulances. He remained in the bedroom with the light off until the police arrived about ten minutes thereafter.

As defendant was leaving the house, at the front door he put the pistol on top of his head and pulled the trigger. Mrs. Price saw blood come down his shirt, but he walked out the door, pistol in hand, just as Police Officers Peoples and Bissett arrived.

Mrs. Price testified that she had seen defendant when he was under the influence of intoxicants, and that he had not been drinking on the night of 25 October 1970.

Before permitting the officers to testify with reference to their encounter with defendant, Judge Braswell heard the following testimony in the absence of the jury to determine the admissibility of any statements which defendant had made to them.

Officer Peoples testified, in substance, as follows:

As he arrived at the Price home defendant came from the front door and walked toward the street. Before the officer could ask him any questions defendant handed him an empty semi-automatic pistol which would hold nine shots and said, "I've killed them, I shot them all. I've killed these people in there. Give me a cigarette." Defendant had a little spot of blood on his forehead and said he had a bullet in his head. In consequence, he was taken to the hospital. It turned out, however, that his wound was not serious, "just a small crease in the cap."

After being x-rayed and sutured, defendant was turned over to the officers. At that time he inquired if his wife was dead. When Peoples told him he did not know, defendant said, "I didn't do such a good job. If I had to do it over again, I would do a better job and make sure they were dead." He then added, "I'd like to borrow a pistol for about two minutes and I'd get rid of some more people, including some goddamn policemen and chain-gang guards." Up to this time no officer had asked defendant any questions whatever.

En route from the hospital to the police station defendant volunteered the following statement to Officer Peoples: "Watson, that fat bastard, is a lucky son of a bitch." Prior to the time defendant made this statement in the car, no one had asked him any questions at all. During the forty-five minutes Officer Peoples was with defendant he detected no odor of alcohol on his breath. His speech and walk were normal and the idea that he might have been under the influence of an intoxicant never occurred to Peoples. Officer Bissett's testimony corroborated that of Peoples.

Detective Nelson S. Lockey testified that at the Raleigh Police Department he advised defendant of his constitutional rights and gave him the full Miranda warning. Thereafter defendant said that he would talk with the officer and that he did not want an attorney at that time. At 11:40 p.m. he gave a statement in which he said he had drunk two pints of blended whiskey that day but he was not then "under the influence." Officers Lockey and Stephenson took defendant to the Wake County jail. En route, at a time when no questions were being asked him and the case was not being discussed, defendant said to the officers, "It looks like I did what I intended to do." As far as Officers Peoples, Lockey, and Stephenson could tell defendant had not been drinking. He appeared to understand what was going on, and his statements were at all times responsive to the questions asked. Officer Bissett testified that "it did not even cross [his] mind that defendant might have been drinking."

Detective Ralph Carroll, who was with defendant for an hour and a half at the Wake Memorial Hospital, testified that during that time he never detected the odor of alcohol on defendant's breath or about his person and, in his opinion, defendant was not under the influence; that knowing what had

State v. Watkins

happened he observed defendant carefully "with that question in mind" and he saw no evidence of intoxication.

On *voir dire* defendant testified that prior to 25 October 1970 he had had nothing to drink for about a year and a half; that on that day he had bought and consumed two pints of liquor, and he was drunk; that he had no recollection of going to the Price home or "ever having seen or talked with Officer Peoples or the officer in the brown coat"; that he does not recall Mr. Lockey telling him his wife was dead; that "Mr. Williams told [him] after they put [him] in a cell upstairs."

Upon the foregoing evidence Judge Braswell found that each of defendant's four statements to the officers was unsolicited, completely voluntary and spontaneous; that at the time defendant made them he was not under the influence of an intoxicant. He ruled that the statements were competent evidence. Officers Peoples, Lockey, and Carroll then gave substantially the same testimony before the jury as they had given upon the *voir dire*. An additional witness, Dr. Kaasa, an expert pathologist, testified that his autopsy of the body of defendant's wife revealed four bullet wounds, two in the head, and that her death was the result of extensive injury to the brain.

At the conclusion of the State's evidence, in the absence of the jury, defendant's counsel informed the court that defendant had authorized and directed him to enter a plea of "guilty of first degree murder."

After considering the matter Judge Braswell ruled (1) that a defendant has a constitutional right to plead guilty of murder in the first degree or any other offense with which he might be charged; (2) that under G.S. 14-17 (1969) the question whether defendant's punishment should be death or life imprisonment was for the jury; and (3) that the jury which had been impaneled to try the case should determine that issue.

After making his ruling Judge Braswell informed defendant that the punishment for murder in the first degree was in the discretion of the jury and that it was either death or life imprisonment, and that his plea, if accepted by the court, eliminated any question of his innocence and established his guilt of murder in the first degree. He then told defendant that he was going to ask him a series of questions to determine whether his plea was understandingly and voluntarily made,

to be certain defendant "understood what was happening to him" and that none of his constitutional rights had been violated. Defendant was instructed that if any of his rights had been violated he was expected to say so then or forever hold his peace. After being duly sworn, in response to questions from the court, defendant testified as follows:

He was not then under the influence of any alcohol, drugs, narcotics, medicines, or other pills. He understood that he was charged with the felony of murder in the first degree. This charge had been explained to him and he was ready for trial. He understood that he had the right to plead not guilty and to be tried by a jury. He pled guilty to this charge of murder in the first degree, and he was in fact guilty of it. He understood that upon his plea of guilty he could either be imprisoned for life or sentenced to death. He had had time to subpoena the witnesses he wanted and to talk and confer with his lawyer, Mr. William Merriman III, about this case. He had conferred with him and was satisfied with his services. Neither the solicitor, Mr. Merriman, nor any policeman, law officer, or anyone else had made any promise or threat to influence him to plead guilty in this case. No one had violated any of his constitutional rights. He had freely, understandingly, and voluntarily authorized and instructed his lawyer, Mr. Merriman, to enter in his behalf a plea of guilty to murder in the first degree. He had no questions to ask the judge about anything and no statement he desired to make. There was no one else he would like to talk to or confer with before he entered this plea of guilty to murder in the first degree. It was his own free and personal decision to enter a plea of guilty to murder in the first degree. He fully realized and understood that, upon the acceptance of this plea, the jury would return to hear any evidence which he and the State might offer concerning punishment; that thereafter the jury would be instructed to consider the evidence and decide by their verdict whether his punishment would be death or life imprisonment. He understood all that and was willing for this to happen.

(The foregoing interrogation was transcribed in question and answer form. After being sworn defendant verified and signed the transcript on 13 June 1972.)

Upon the completion of Judge Braswell's examination of defendant, his attorney, Mr. Merriman, told the court in defendant's presence that he and defendant had discussed the plea at

length that morning and defendant "has decided that it is in his best interest to enter a plea."

For the record, the solicitor stated that at the time defendant was in court for the appointment of counsel defendant told him "that he would like to be able to enter a plea of guilty to the crime"; that later defendant's attorney had approached him, but he "had thought that the law, though it did not prohibit [such a plea] as far as we know, might not be interpreted to permit it." The solicitor further informed the court defendant's counsel had requested him to agree that no arguments would be made to the jury if defendant entered a plea; that he had refused this request and, at the same time, told counsel he would argue for the death penalty. Mr. Merriman verified the solicitor's statement and said he had fully informed defendant of the solicitor's position.

The jury was then recalled and informed of defendant's plea. The judge then instructed them (1) that defendant's plea of guilty of murder in the first degree eliminated all issues except the question whether his punishment would be death or life imprisonment, a matter which the law left to their "complete and unbridled discretion"; (2) that the trial would "go forward with evidence concerning punishment."

The State, having completed its evidence, defendant offered evidence tending to show:

About 4:00 p.m. on 25 October 1970 he arrived at the home of his cousin, Larry Watkins, who lived near Morrisville. At that time defendant was drunk. After staying with his cousin only five minutes defendant left saying he was going to Durham to get another pint of liquor.

In addition to his testimony hereinbefore referred to, defendant testified, in substance, as follows: On 25 October 1970 he left his mother's house about 11:00 a.m. and went to a bootleg house. There he purchased a pint of liquor for $4.00 and bought "a nice pistol" for $10.00 from a fellow there who wanted money to buy liquor. At that time he had no idea of shooting his wife or anybody else and he had not planned to go to. the Price home. Between 12:30 p.m. and the time he went to Morrisville he drank the pint. From Morrisville he went to Durham, where he bought another pint and drank that. The last thing he remembered on that day was "being out close to the airport

and sitting there drinking." He did not remember going to the Price home, shooting the pistol, or going to the hospital. The first thing he remembered after drinking the second pint was being in jail. He had been mad with his wife a year earlier, but on 25 October 1970 he was not mad with her.

At the conclusion of the evidence Judge Braswell, in a charge to which no exception is taken, instructed the jury as required by G.S. 14-17 on the question of punishment for murder in the first degree. The jury, after deliberating seventeen minutes returned their verdict. In response to the clerk's inquiry, "How say you: Shall the defendant be punished with death or do you recommend life imprisonment?" the answer was, "The jury recommends life in prison."

The court inquired whether defendant desired that the jury be polled and counsel answered, "No."

Upon the jury's verdict, on 13 June 1972, Judge Braswell entered judgment that defendant be imprisoned for the term of his natural life in the State's prison. Defendant gave no notice of appeal. However, on 20 June 1972 the clerk of the Superior Court of Wake County received from defendant in Central Prison a notice of appeal and a petition that he be allowed (1) "to proceed on appeal *in forma pauperis* as an indigent"; and (2) "to represent himself in this appeal perfection."

On 27 June 1972 Judge Braswell signed an order authorizing defendant to appeal as an indigent and directed defendant's trial attorney to "be available for such consultation and assistance in the legal technicalities of appeal [about] which the defendant appellant may want professional advice."

*Attorney General Morgan and Assistant Attorney General Giles for the State.*

*Jerry Douglas Watkins, defendant pro se.*

SHARP, Justice.

Defendant's case on appeal and brief are signed "Jerry Douglas Watkins, Defendant in propria persona." His appeal, taken after a plea of guilty, presents for review only the question whether error appears on the face of the record. *State v. Caldwell*, 269 N.C. 521, 153 S.E. 2d 34 (1967) ; *State v. Newell*, 268 N.C. 300, 150 S.E. 2d 405 (1966).

Defendant's assignments which require discussion are that the trial court erred in accepting his plea of guilty to murder in the first degree, in accepting the verdict of the jury, and in imposing a life sentence upon him. He asserts (1) that under the law of this State a jury must determine whether murder is in the first or second degree, and a defendant will not be permitted to plead guilty to murder in the first degree; (2) that Judge Braswell's acceptance of his plea was a nullity "totally without precedent" and a violation of defendant's rights under N. C. Const. art. I, § 19 and the Fourteenth Amendment to the United States Constitution; and (3) that neither defendant's plea nor the jury's verdict will support a sentence.

At the outset, we note that defendant's plea was entered on 13 June 1972, sixteen days before the U. S. Supreme Court, on 29 June 1972, decided *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726. *Furman* invalidated any death sentence imposed under a statute which leaves to the discretion of either judge or jury whether a sentence shall be death or life imprisonment. Thus a death sentence imposed under G.S. 14-17 as then constituted cannot be carried out. *See State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). Prior to *Furman,* the status of the death penalty under G.S. 14-17 was uncertain. However, defendant knew that G.S. 14-17 made either death or life imprisonment the penalty for first-degree murder, and he believed that if his plea was accepted his punishment would be one or the other.

The Attorney General concedes that on 13 June 1972 no statute or case law in this State specifically authorized the court to accept a plea of guilty to first-degree murder. He submits, however, that defendant has suffered no prejudice because (1) the State's evidence points unerringly to defendant's guilt of first-degree murder; (2) defendant does not challenge the fact that his plea was freely, understandingly, and voluntarily made; and (3) the jury's verdict imposed the minimum punishment of life imprisonment.

[1] Undoubtedly, at common law, a defendant of competent understanding, duly enlightened, had the right to plead guilty to a capital crime instead of denying the charge. *See Green v. Commonwealth,* 94 Mass. (12 Allen) 155 (1866); 31 N.C. L. Rev. 405 (1953). According to Blackstone, upon "the prisoner's confession of the indictment . . . the court hath nothing to

do but award judgment: but it is usually very backward in receiving and recording such confession, out of tenderness to life of the subject; and will generally advise the prisoner to retract it, and plead to the indictment." 4 Blackstone, *Commentaries* *324. In noting the reluctance of courts to accept a plea of guilty of a crime for which the penalty is death, Bishop said, "Thus, where one tendered [this plea] in a capital case, the judges would not accept it till they had explained to him its serious nature, sent him back to his cell for reflection, brought him again into court, had the indictment read to him a second time, and examined witnesses as to his sanity, and whether or not promises of clemency had been made to him . . . , [a]nd in some of the states there are varying statutory and other devices to protect defendants from improvident pleas of guilty." 2 Bishop, *New Criminal Procedure* § 795 (2d ed. 1913). *See also* 1 Greenleaf, *Law of Evidence,* § 216 (16th ed. 1899).

In this country today it is generally held that every accused has the right to plead guilty and one may do so even in a capital case unless prohibited by statute. Annot., 6 A.L.R. 694 (1920); 21 Am. Jur. 2d *Criminal Law* § 484 (1965); 22 C.J.S. *Criminal Law* § 422(1), (4) (1961). *See also* Fed. R. Crim. P. 11, 18 U.S.C.A.; *Donnelly v. United States,* 185 F. 2d 559 (10th Cir. 1950); *Territory v. Miller,* 4 Dak. 173 (1886). However, "one accused of a capital offense has no constitutional right to plead guilty." 22 C.J.S. *Criminal Law* § 422(1) (1961). *Accord,* 21 Am. Jur. 2d *Criminal Law* § 484 (1965). *See also People v. Ballentine,* 39 Cal. 2d 193, 246 P. 2d 35 (1952); Annot., 6 A.L.R. 694, 695 (1920); *Hallinger v. Davis,* 146 U.S. 314, 36 L.Ed. 986, 13 S.Ct. 105 (1892); 31 N.C. L. Rev. 405-06 (1953).

It is settled law in this State that a plea of guilty, freely, understandingly, and voluntarily entered, is equivalent to a conviction of the offense charged. *State v. Shelly,* 280 N.C. 300, 185 S.E. 2d 702 (1972); *State v. Wynn,* 278 N.C. 513, 180 S.E. 2d 135 (1970); *State v. Miller,* 271 N.C. 611, 157 S.E. 2d 211 (1967); *State v. Perry,* 265 N.C. 517, 144 S.E. 2d 591 (1965).

In *State v. Branner,* 149 N.C. 559, 63 S.E. 169 (1908), a case involving a prosecution for disturbing religious worship, in discussing the nature and effect of a plea of guilty, Justice Walker said: When a defendant "directly, and in the face of the court, admits the truth of the accusation" in the indictment, "[t]his is called a plea of guilty and is equivalent to a convic-

tion. The court then has nothing to do but award judgment as upon a verdict of guilty, but, of course, may hear evidence for the purpose of enabling it to determine the measure of punishment . . . . " *Id.* at 561, 63 S.E. at 170 (citations omitted). However, Justice Walker also said that "a judge cannot compel a defendant against his will to plead not guilty and submit to a trial, for undoubtedly a prisoner of competent understanding, duly enlightened, has the right to plead guilty instead of denying the charge, yet, in proportion to the gravity of the offense, the court should exercise caution in receiving this plea and should see that he is properly advised as to the nature of his act and its consequences. This is a matter which is left to the good judgment and discretion of the court, which should be exercised so as to protect a defendant from an improvident plea and to prevent injustice." *Id.* at 563, 63 S.E. at 171.

Although North Carolina has had no statute specifically prohibiting a court from accepting a plea of guilty in a capital case, to our knowledge no judge had ever accepted a plea of guilty of a crime for which the punishment could be (or was thought to be) death prior to Judge Braswell's acceptance of defendant's plea in this case. It has been the universal practice of the trial judges to require the entry of a plea of not guilty, and to have a jury determine the guilt or innocence of the accused. Indeed, it has been generally understood by both bench and bar that the law required this procedure. However, the authority cited for it in our decisions hardly seems to sustain the proposition.

When Sections One and Two of Chapter 85, N. C. Sess. Laws (1893) (now G.S. 14-17) divided murder into two degrees, Section Three (now G.S. 15-172 (1965)) provided that the division required no alteration in the existing statutory form of indictment for murder, "but the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree."

In *State v. Blue,* 219 N.C. 612, 14 S.E. 2d 635 (1941), the defendant who was convicted of murder upon his plea of not guilty, was awarded a new trial for errors in the charge. Justice (later Chief Justice) Winborne, said: "[I]n this State a defendant will not be permitted to plead guilty to murder in the first degree. It is provided in [G.S. 15-172] that the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree." *Id.* at 616, 14

S.E. 2d at 637. The statute and the two cases cited in *Blue* immediately following the statement that a defendant will not be permitted to plead guilty to murder in the first degree do not support the proposition.

*State v. Simmons,* 236 N.C. 340, 72 S.E. 2d 743 (1952), was also a case in which the defendant, convicted of murder after having pled not guilty, was awarded a new trial for errors in the charge. By way of dictum Justice Winborne again said, "In this connection, this Court has held that in this State a defendant will not be permitted to plead guilty to murder in the first degree. *S. v. Blue,* 219 N.C. 612, 14 S.E. 2d 635, and cases there cited." *Id.* at 341, 72 S.E. 2d at 744. For a statement of similar import in a factually similar case *see State v. Murphy,* 157 N.C. 614, 72 S.E. 1075 (1911).

The statutory form of an indictment for murder, prescribed by Chapter 58, N. C. Sess. Laws (1887) (now G.S. 15-144), antedated the division of murder into two degrees (G.S. 14-17). Although the form contained, *inter alia,* an averment that the accused killed his alleged victim "feloniously, wilfully and of his malice aforethought," it did not include specific averments of premeditation and deliberation, essential ingredients of murder in the first degree. This omission, however, became immaterial when legislative fiat made the existing form a sufficient indictment for murder in either the first or second degree. G.S. 15-172; *State v. Talbert,* 282 N.C. 718, 194 S.E. 2d 822 (1973); *State v. Duncan,* 282 N.C. 412, 193 S.E. 2d 65 (1973); *State v. Matthews,* 142 N.C. 621, 55 S.E. 342 (1906). Clearly, therefore, the purpose of the requirement that the jury determine whether one charged under the statutory form is guilty of murder in the first or second degree, was merely to eliminate that uncertainty *when the defendant's plea was not guilty.*

It has never been doubted that a defendant indicted for murder in the form prescribed by G.S. 15-144, could plead guilty of murder in the second degree or manslaughter. Thus, it appears that the statutory requirement that the jury determine the degree of murder of which a defendant is guilty is only incidentally related to the death penalty. *See Green v. Commonwealth, supra.*

It was suggested in *State v. Peele,* 274 N.C. 106, 111, 161 S.E. 2d 568, 572, *cert. denied,* 393 U.S. 1042 (1968), that the statutory authority for the rule stated in *Murphy, Blue,* and

*Simmons,* repeated in *Peele,* that our practice does not permit a defendant to plead guilty to a capital felony, was to be found in the word *convicted* as used in the first sentence of G.S. 15-189 (1965). This sentence says, "Upon the sentence of death being pronounced against any person in the State of North Carolina convicted of a crime punishable by death, it shall be the duty of the judge pronouncing such sentence to make the same in writing. . . ."

In *Peele,* we ignored the rule that when a defendant unequivocally and unconditionally pleads guilty to a specific crime he has supplied any want of evidence and furnished the necessary proof. "He has convicted himself." *State v. Branner, supra* at 562, 63 S.E. at 170; *State v. Perry, supra.* Since an accused may be convicted by his plea as well as by a verdict, we see no reason to read into G.S. 15-189 a legislative attempt to distinguish between conviction by plea and by verdict.

Notwithstanding the lack of statutory authority to sustain the rule promulgated by the Court, that an accused will not be permitted to plead guilty to a crime for which the penalty is death, the legislature has not seen fit to change it. It has long since become the public policy of this State. Indeed, one accused of a capital crime may not even waive the finding of a bill of indictment against himself. G.S. 15-140.1 (1965). The idea that a person should be allowed to decree his own death has been unacceptable, not only to the judiciary, but to the citizens at large. This State has inflicted the supreme penalty only when a jury of twelve has been convinced beyond a reasonable doubt of the guilt of the accused after a trial conducted with all the safeguards appropriate to such a proceeding.

In 1953, by G.S. 15-162.1 (repealed 1971), the General Assembly authorized a defendant charged with a capital crime, after arraignment, to tender a plea of guilty signed by himself and his counsel. However, if the plea was accepted by the State *and* the court, the statute provided that the defendant's punishment "shall be imprisonment for life in the State's prison." Thus, in the only instance in which the legislature ever authorized a plea of guilty to a crime for which the punishment *could* be death, it did so to enable the accused to avoid that ultimate punishment. With reference to this statute, in *State v. Peele, supra* at 111, 161 S.E. 2d at 572, this Court said:

"Except as provided in G.S. 15-162.1, the North Carolina practice will not permit a defendant to plead guilty to a capital

State v. Watkins

felony. * * * G.S. 15-162.1 is primarily for the benefit of a defendant. Its provisions may be invoked only on his written application. It provides that the State and the defendant, under rigid court supervision, may, without ordeal of a trial, agree on a result which will vindicate the law and save the defendant's life."

In a concurring and dissenting opinion in *State v. Spence,* 274 N.C. 536, 553, 164 S.E. 2d 593, 603, *vacated,* 392 U.S. 649, 20 L.Ed. 2d 1350, 88 S.Ct. 2290 (1968), Chief Justice Bobbitt noted that "[p]rior to the adoption of G.S. 15-162.1, the Court would not under any circumstances accept a plea of guilty of murder in the first degree."

The Supreme Court of the United States, however, caused the repeal of G.S. 15-162.1 by its decision in *U. S. v. Jackson,* 390 U.S. 570, 20 L.Ed. 2d 138, 88 S.Ct. 1209 (1968). *See* N. C. Sess. Laws, Ch. 117 (1969) ; N. C. Sess. Laws, Ch. 562 (1971) ; N. C. Sess. Laws, Ch. 1225 (1971) ; *State v. Miller,* 276 N.C. 681, 174 S.E. 2d 481 (1970), *vacated,* 408 U.S. 937, 33 L.Ed. 2d 755, 92 S.Ct. 2863 (1972) ; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241 (1969) (dissenting opinion), *rev'd on other grounds,* 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971).

[2] It is quite clear that the legislature never contemplated a jury verdict upon the issue of punishment alone. G.S. 14-17 made death the penalty for murder in the first degree, *unless* "at the time of rendering [the] verdict in open court" the jury recommended that the punishment be imprisonment for life. Thus, the *jury's* discretion as to the sentence could be exercised only in connection with its verdict upon the issues of the guilt or innocence of the accused.

It follows, therefore, that Judge Braswell was in error in submitting the question of punishment to the jury. It does not follow, however, that defendant's plea and sentence must be set aside.

[3] A capital crime is one which is or may be punishable by death. *State v. Mems,* 281 N.C. 658, 674, 190 S.E. 2d 164, 175 (1972) (concurring opinion) ; 12 C.J.S. 1129 (1938). The basis of the rule that a defendant cannot plead guilty to a capital crime is the fixed belief that a person should not sign his own death warrant and hang himself. There is no rule which precludes a plea of guilty to a crime for which the maximum pun-

ishment is life imprisonment. On 13 June 1972, the date defendant pled guilty of a murder committed on 25 October 1970, murder was not a capital crime; the only permissible punishment for murder in the first degree was life imprisonment. *State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973). Had defendant's plea been not guilty, had the jury's verdict been guilty of murder in the first degree without a recommendation that his punishment be imprisonment for life, and had Judge Braswell sentenced defendant to death, the decision in *Furman* would have required us to vacate the death sentence and to order the superior court to impose a life sentence just as we did in *Waddell,* and also in *State v. Hill,* 279 N.C. 371, 183 S.E. 2d 97 (1971) and other cases in which the United States Supreme Court vacated the death sentence under the authority of *United States v. Jackson.*

It is true that at the time defendant entered his plea of guilty he did so in the belief (shared by court and counsel) that the jury would have to fix his punishment and that it would be death, unless the jury recommended it be life imprisonment. It may also be true that defendant was moved to enter the plea by the hope that his confession of guilt would cause the jury to recommend life imprisonment. If so, the strategy accomplished his purpose. However, it was strategy based solely upon his own notions of psychology, for G.S. 15-162.1 had been repealed. The law offered him no inducement to plead guilty.

In this case the State's evidence made out a vicious case of murder in the first degree. Defendant's only defense, amnesia brought on by the voluntary consumption of alcohol, was not one likely to be readily accepted by the jury in view of the State's evidence tending to show his prior threats to kill his wife and his volunteered post-arrest statements that he had done what he intended to do. Considering all the circumstances, it is not surprising that defendant was willing to enter a plea of guilty of murder in the first degree, and it is clear that the State would have accepted no lesser plea. We can perceive no possible prejudice to defendant from his plea. The jury's verdict gave him the life sentence he had asked for, the minimum punishment for murder in the first degree under the law as it was then thought to be.

Defendant makes no contention that his plea was coerced by the fear of death or that it was not voluntarily and under-

standingly made. Indeed, the record shows it to have been his considered choice, freely made after consultation with competent counsel. Defendant's contention is that his plea was void because it was a plea of guilty to a capital crime. As heretofore pointed out, this contention is not correct. We note, however, that had the homicide occurred after 18 January 1973, the contention would have had to be sustained. See *State v. Waddell, supra.*

The judgment of the Superior Court is

Affirmed.