STATE OF NORTH CAROLINA v. MARCUS B. SHRADER III

No. 7

(Filed 17 June 1976)

1. **Homicide § 4— killing in perpetration of felony — first degree murder**
    The killing of another human being, whether intentional or otherwise, while the person who kills is engaged in the perpetration of a felony, which felony is inherently or foreseeably dangerous to human life, is murder at common law.

2. **Homicide § 4— when killing is in perpetration of felony**
    A killing is committed in the perpetration of a felony when an unbroken chain of events leads from such felony to the act causing death, so that the homicide is part of a series of events forming one continuous transaction.

**3. Homicide § 21— homicide in perpetration of robbery and kidnapping — absence of intent to fire pistol**

Where all the evidence showed an unbroken chain of events leading from a kidnapping of the victim to a bank robbery and thence to the shooting of the victim with a pistol, the killing of the victim was murder in the first degree even if defendant's testimony that he did not intend to fire the pistol is taken as true.

**4. Homicide § 12— indictment — first degree murder — premeditation and deliberation or perpetration of felony**

An indictment for murder in the form prescribed by G.S. 15-144 was sufficient to support a verdict of guilty of murder in the first degree if the jury found from the evidence, beyond a reasonable doubt, that defendant killed the deceased with malice and after premeditation and deliberation or that he killed deceased in the perpetration of a robbery or of a kidnapping.

**5. Criminal Law § 23; Homicide § 13— guilty plea to capital crime — public policy**

Public policy, established by previous decisions of the Supreme Court, precludes the acceptance of a plea of guilty to a crime for which the penalty is death; this policy, however, does not preclude the State from offering evidence of a confession, voluntarily and lawfully made by the accused, nor does it preclude the accused from testifying voluntarily at his trial or the jury from considering matters to which he testified in arriving at its verdict that he is guilty of a capital crime.

**6. Criminal Law § 23; Homicide § 13— guilty plea to kidnapping — no guilty plea to first degree murder**

In a prosecution for first degree murder wherein the evidence tended to show that the killing was committed in the perpetration of a robbery and kidnapping, the acceptance of defendant's plea of guilty of kidnapping at the close of all the evidence was not tantamount to the acceptance of a plea of guilty of first degree murder in violation of public policy precluding the acceptance of a plea of guilty to a capital crime.

**7. Criminal Law § 66— in-court identification — admissibility**

The trial court did not err in the admission of an in-court identification of defendant where the evidence on *voir dire* supported findings by the court that the in-court identification of defendant by the witness was not tainted by any extraneous or unlawful or impermissible suggestion by anyone, or by photographs exhibited to him by the police, to whom the witness had given an accurate description of defendant prior to his seeing such photographs.

**8. Criminal Law § 34— evidence of other crimes**

Nothing else appearing, the State cannot, through its own witnesses, offer evidence tending to show the defendant has committed another distinct, independent, separate offense having no relation to the crime charged, except its tendency to show his disposition to commit a crime of the nature of the one for which he is on trial.

State v. Shrader

9. **Criminal Law §§ 34, 89— evidence of other crimes — rebuttal of impeachment of witness** ·

Where the nature of defendant's cross-examination of a witness for impeachment purposes in a kidnapping and murder trial was such as to suggest to the jury that the witness, independent of the defendant, had been involved in other kidnappings and murders, the State was entitled, for the purpose of rebutting this impeaching evidence, to show on redirect examination that defendant was the kidnapper and murderer on the other occasion; furthermore, defendant's failure to object to the introduction of such evidence on redirect examination was a waiver of his right to do so, and the admission of such evidence, even if incompetent, is not ground for a new trial.

10. **Criminal Law § 87; Witnesses § 1— competency of witness — promise of State not to prosecute for certain crimes**

In this prosecution for kidnapping and murder, defendant's stepdaughter was not incompetent as a witness on the ground that she had been promised, in exchange for her testimony as a witness for the State, that she would be charged only with the offense of aiding and abetting in the kidnapping of the victim and would not be prosecuted for her murder.

11. **Criminal Law § 101— allowing jury access to news sources — instructions by court**

The trial court in a kidnapping and murder case did not err in allowing the jury access to television and other news sources where the court instructed the jury not to discuss the case with anyone and not to read about the case in the newspapers or watch or listen to anything about it on television or radio, and where there was no indication of any misconduct on the part of any juror or any disregard of the court's instructions.

12. **Constitutional Law § 36— death penalty — constitutionality**

The death penalty for first degree murder does not constitute cruel and unusual punishment.

APPEAL by defendant from *Fountain, J.,* at the 2 December 1974 Criminal Session of ONSLOW.

The defendant was brought to trial upon two indictments, one charging him with the murder of Cheryl Potter Boyd, the other charging him with kidnaping her. To each indictment he originally entered a plea of not guilty. At the conclusion of all of the evidence, he changed his plea to the kidnaping charge to a plea of guilty. This was done after an extensive interrogation by the court, in the absence of the jury, in which the court fully explained the possible consequences of such plea with reference to the charge of murder, and after the court ascertained that the defendant's decision to change his plea was made by him voluntarily, after full consultation with his coun-

sel and with understanding of its consequence upon the charge of kidnaping and its possible consequence on the charge of murder.

The court thereupon instructed the jury that by reason of the defendant's change of his plea, the charge of kidnaping was no longer for their consideration, as such, but, by such plea, the defendant was not to be deemed to have admitted the fact of kidnaping insofar as it related to the murder charge. In its instructions to the jury on the murder charge, the court fully instructed the jury as to the law relating to murder committed in the perpetration of kidnaping, as to the elements of kidnaping and as to the burden of proof resting upon the State with reference to the commission of a murder in the perpetration of a kidnaping. The defendant assigns as error the acceptance by the court of the defendant's plea of guilty to the charge of kidnaping but makes no assignment of error as to the charge of the judge to the jury.

The evidence for the State consisted of the testimony of the defendant's stepdaughter, who testified that she was his companion throughout the series of events and an eyewitness to the kidnaping and the shooting of Mrs. Boyd, the testimony of another witness identifying the defendant as the companion of Mrs. Boyd during the brief interval between her kidnaping and her death, the testimony of other witnesses identifying photographs of a masked bank robber using Mrs. Boyd as a hostage as photographs of the defendant, the testimony of numerous expert witnesses and a large number of exhibits.

If true, the State's evidence was ample to show:

The defendant and his stepdaughter, for some ten days prior to 16 August 1974, drove about the vicinity of Camp Lejeune, where he was stationed as a member of the Marine Corps, and the Town of Jacksonville, looking for a car to use in a bank robbery. While so driving in the late morning of 16 August 1974, they observed Mrs. Cheryl Potter Boyd, previously unknown to them, park her car in the parking lot of the post office in Jacksonville. At the defendant's direction the stepdaughter parked beside Mrs. Boyd's car.

When Mrs. Boyd emerged from the post office and re-entered her car, the defendant, armed with a .45 caliber automatic pistol, got out of his car and entered the car of Mrs.

State v. Shrader

Boyd. Thereupon, Mrs. Boyd drove her car from the parking lot, the defendant directing his stepdaughter to follow, which she did. They proceeded to another parking lot where, at the defendant's direction, the stepdaughter handed him a parachute bag from which he removed a green ski mask, a blue jacket with red and yellow stripes, a white pillow case and brown gloves. The stepdaughter remained in the second parking lot in the defendant's automobile. Mrs. Boyd's car left the parking lot, Mrs. Boyd driving and the defendant riding therein.

Within a few moments, Mrs. Boyd, accompanied by a man wearing a green ski mask and a blue jacket with red and yellow stripes, carrying a white pillow case and brandishing a .45 caliber pistol, entered the North Carolina National Bank in Jacksonville. Mrs. Boyd was obviously frightened. The defendant compelled three tellers of the bank to put money of the bank into the pillow case. A portion of the money placed therein by the tellers consisted of bills, known as "bait money," the serial numbers of which were recorded by the bank. Cameras in the bank, activated by the tellers, took photographs of the robbery. Persons acquainted with the defendant identified the photographs of the robber, wearing the green ski mask, as photographs of the defendant.

The robber and Mrs. Boyd then left the bank, she being compelled by the robber to accompany him, entered her automobile and drove away. They returned to the parking lot where the defendant's stepdaughter awaited them, Mrs. Boyd driving. The Boyd car then left the parking lot, the defendant directing his stepdaughter to follow. They proceeded to an alley in the rear of the A & P store in Jacksonville where both cars stopped adjacent to each other. Mrs. Boyd threw out the keys to her car. The defendant then got out of the Boyd car on the passenger side, threw his gloves into his own automobile, driven by the stepdaughter, then turned around and shot Mrs. Boyd with the .45 caliber pistol, got into his own car, driven by the stepdaughter, carrying the white pillow case. They drove to yet another point at which the defendant had previously parked a van owned by him and in which he had earlier changed from his military uniform to the clothes worn during the above mentioned events. Reentering the van, he changed back into his military uniform and returned to the Marine Base.

The robbery of the bank occurred at 1:30 p.m. A police alarm was immediately activated. At approximately 2 p.m., Mrs.

Boyd's car was discovered by police officers at the rear of the A & P store. Mrs. Boyd was in the driver's seat. She was dead, having sustained a bullet wound in or near the right eye. The motor of her car was still warm. The cause of her death was the bullet wound, death apparently being instantaneous. The fatal bullet was recovered from Mrs. Boyd's head and was identified by a ballistics expert as having been fired from the defendant's pistol. A fingerprint made by the defendant's right ring finger, pointing downward, was found on the outside of the glass of the window of Mrs. Boyd's car on the passenger side, this glass being almost completely rolled down.

Packages of money in substantially the total amount taken from the bank were found in the freezer in the defendant's home. These included the "bait money" placed in the pillow case at the robber's direction by two of the bank tellers.

At the conclusion of the State's evidence, the defendant's counsel, in the absence of the jury, advised the court that the defendant, contrary to the advice of his counsel, insisted upon taking the witness stand. Having ascertained from the defendant's counsel that this was contrary to their advice and that they had fully and completely conferred with the defendant concerning his right to testify and his right not to testify, the court interrogated the defendant and ascertained that, notwithstanding the advice of his counsel, he desired to testify. He did so, his testimony being the only evidence for the defendant. His testimony was to the following effect:

On the morning of 16 August 1974, after parking his van and therein changing from his military uniform to civilian clothes, he and his stepdaughter drove about in his automobile, the stepdaughter driving. Observing Mrs. Boyd, whom he did not know, entering the post office, the defendant told his stepdaughter, "I'm going to take that girl, I'm going to rob a bank." They, thereupon, parked beside Mrs. Boyd's automobile.

When Mrs. Boyd returned to her automobile, the defendant got out of his car with his .45 caliber pistol in his hand, opened the door of Mrs. Boyd's car and slid into the passenger seat. He told Mrs. Boyd: "Stay calm, you're going to be all right, you're not going to get hurt. You and I are going to rob a bank." Mrs. Boyd was frightened.

At the defendant's direction, Mrs. Boyd drove out of the post office parking lot, the defendant's stepdaughter following

in his car. They drove to another parking lot where the two vehicles again parked side by side. At the defendant's direction, the stepdaughter handed to the defendant a parachute bag containing a blue jacket, gloves, a ski mask and a pillow case.

At the defendant's direction, Mrs. Boyd then drove to the bank. He put on the ski mask and, with his pistol in his hand, directed Mrs. Boyd to precede him into the bank, which she did. There he directed the three tellers to put their money in the pillow case and directed all other persons in the bank to remain still. These directions were followed. Taking the pillow case, now containing the money, the defendant handed it to Mrs. Boyd and, taking her by the arm and trying to calm her fears, he directed Mrs. Boyd out of the bank and into her car. He also entered the car and, with the pistol in his lap, directed Mrs. Boyd to drive away, which she did, following his direction.

They returned to the parking lot at which they had left the defendant's stepdaughter and proceeded from there, with the stepdaughter following in the defendant's car, to the alley where both cars were brought to a stop. At the defendant's direction, Mrs. Boyd turned off the engine of her car and, also at his direction, threw her keys out of the window. The defendant raised his hand and as Mrs. Boyd started to turn around, "her head jumped back, like that [demonstrating]. Her head was still in the air. She was smiling when she was turning back and her hand dropped down to her lap and her body started to shake [demonstrating], tremors, I had seen it before and I knew she was dead. Didn't hear a gun shot." He looked at the pistol and the safety was off.

The defendant got out of Mrs. Boyd's car, carrying the pillow case with the money, entered his car and he and the stepdaughter drove away, returning to the place where he had previously parked his van, which he entered and therein changed back to his military uniform.

The defendant testified: "I did not mean for her to die then, I shot her at that time but I didn't want her to die, not then. I did not mean to shoot her, not then, but when I first saw her. I did not deliberately shoot Cheryl Boyd. I didn't form an intent to destroy the girl. I knew I was going to rob a bank. She didn't behave the way she was supposed to behave. Things didn't go right at the bank. When she threw the keys out I

State v. Shrader

was just confused. I just wanted to get to Debbie [the step-daughter] and get the hell out of there." The defendant expressed concern for his stepdaughter and his desire to absolve her from all complicity in the events of the morning on the ground that she was simply doing what he had told her to do. He further testified that the investigating officers told him of his constitutional rights and he understood them. He consented to the search of his house by these officers, through which search they discovered the pistol. (A subsequent search pursuant to a search warrant disclosed the money in the freezer.)

The defendant testified that he had been having sexual relations with his stepdaughter for approximately two years but denied her earlier testimony that he raped her when she was 12 years of age. He further testified: "I don't know why I robbed the NCNB bank. It was mostly the girl. When I first saw her I knew what I was going to do. I knew I was going to destroy her. Killing her was my primary thinking. She was an example of my wife. * * * I am responsible for the abduction of Cheryl Potter Boyd. I did the bank robbery at NCNB. I didn't deliberately shoot her. I initially intended to destroy her. I changed my mind at the bank. I couldn't go through with it. It was on and off. I was coming apart."

On cross-examination, the defendant testified that he knew it was against the law to kidnap and to rob a bank, that murder is a capital crime and that he was kidnaping Mrs. Boyd at the post office and at that time he "was going to destroy her." He further testified on cross-examination: "The girl was frightened. I told her what to do and it didn't work out that way. I had no intention about killing her from part way through the bank robbery. It was a matter of her behavior. She was frightened. That was one of the reasons. There were others." He acknowledged his ownership of the pistol, identified by the State's evidence, as the weapon from which the fatal bullet was fired.

Defendant's trial counsel having ceased to practice law, Donald P. Brock was appointed to represent him on appeal.

*Rufus L. Edmisten, Attorney General, by Lester V. Chalmers, Jr., Assistant Attorney General, for the State.*

*Donald P. Brock for defendant.*

LAKE, Justice.

**[1-3]**  The killing of another human being, whether intentional or otherwise, while the person who kills is engaged in the perpetration of a felony, which felony is inherently or foreseeably dangerous to human life, is murder at common law. *State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1972) ; *State v. Streeton,* 231 N.C. 301, 56 S.E. 2d 649 (1950) ; *State v. Levelle,* 34 S.C. 120, 13 S.E. 319 (1891) ; *Regina v. Horsey,* 3 Fost. & F. 287 (Kent Assizes, 1862) ; *Regina v. Serne,* 16 Cox Crim. Cas. 311 (1887) ; Harno Cases and Materials on Criminal Law and Procedure, 318 (Callaghan, 1939) ; 40 C.J.S., Homicide, § 21 (1944). Kidnaping and robbery are such felonies. *State v. Streeton, supra; State v. Jarrette,* 284 N.C. 625, 651, 202 S.E. 2d 721 (1974) ; *State v. Moore,* 284 N.C. 485, 202 S.E. 2d 169 (1974). A killing is committed in the perpetration of a felony when an unbroken chain of events leads from such felony to the act causing death, so that the homicide is part of a series of events forming one continuous transaction. *State v. Thompson, supra;* 40 Am. Jur. 2d, Homicide, § 73 (1968). In the present case, the evidence, both that for the State and that for the defendant, shows an unbroken chain of events leading from the kidnaping to the robbery and thence to the shooting of Mrs. Boyd. Thus, even if the defendant's testimony that he did not intend to fire the pistol is taken as true, the killing of Mrs. Boyd was murder, there being no statute of this State changing the definition of murder from that of the common law. A murder committed with premeditation and deliberation *or* in the perpetration of a kidnaping *or* in the perpetration of a robbery is murder in the first degree. G.S. 14-17. The prescribed punishment for such a murder is death by asphyxiation. G.S. 14-17.

**[4]**  The indictment for murder under which the defendant was charged is in the form prescribed by G.S. 15-144. It alleges that the defendant "feloniously, wilfully, and of his malice aforethought, did kill and murder Cheryl Potter Boyd contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State." Such an indictment is sufficient to support a verdict of guilty of murder in the first degree if the jury finds from the evidence, beyond a reasonable doubt, that the defendant killed the deceased with malice and after premeditation and deliberation *or* that he killed her in the perpetration of a robbery or of a kidnaping. The evidence is ample to support a verdict on each of these three

theories. The jury was instructed completely and accurately upon each of them. The defendant assigns no error in the charge to the jury.

[6]   The defendant contends that the trial court erred in accepting his plea of guilty to the charge of kidnaping. It is the defendant's contention that, when the defendant, at the close of all the evidence, changed his plea as to the charge of kidnaping from "not guilty" to "guilty," this was tantamount to his entering a plea of guilty to first degree murder because of the above mentioned rules of law.

As Justice Sharp, now Chief Justice, said in *State v. Watkins*, 283 N.C. 17, 30, 194 S.E. 2d 800 (1973), after noting a lack of statutory authority to sustain the rule promulgated by our predecessors on this Court that an accused will not be permitted to plead guilty to a crime for which the penalty is death, "It has long since become the public policy of this State." Nevertheless, there is no merit in this contention of the defendant. Kidnaping is not a crime punishable by death. Indeed, no punishment has yet been imposed upon the defendant for the crime of kidnaping. He was sentenced to death for the crime of murder in the first degree. He did not plead guilty of that offense.

[5]   The public policy upon which the defendant relies is simply that no person shall be put to death in this State for a crime until he has been duly indicted therefor and, at a trial, conducted pursuant to law, evidence has been introduced sufficient to support a finding of every element of the offense and a duly constituted jury, properly instructed upon the law, has found from the evidence, beyond a reasonable doubt, that he has committed each element of such offense. A plea of guilty, when accepted, being the equivalent of a conviction, no evidence of guilt is required and no verdict of a jury is required as a prerequisite to the imposition of a lawful sentence. Thus, the said public policy, established by our predecessors on this Court, precludes the acceptance of a plea of guilty to a crime for which the penalty is death. This policy, however, does not preclude the State from offering evidence of a confession, voluntarily and lawfully made by the accused, nor does it preclude the accused from testifying voluntarily at his trial or the jury from considering matters to which he testified in arriving at the verdict that he is guilty of a capital crime.

In the present case, the defendant, voluntarily, contrary to the advice of his counsel, and after careful interrogation by

the court in the absence of the jury, testified. His testimony corroborated the evidence introduced by the State in virtually every particular. There was no error in permitting him to do so, or in permitting the jury to consider his testimony in arriving at its verdict. The court carefully and correctly instructed the jury that the defendant's plea of guilty to the offense of kidnaping did not absolve the jury from the necessity of finding, beyond a reasonable doubt, that the offense of kidnaping had been committed, in order for the jury to reach a verdict of guilty of murder in the first degree on the theory that the murder occurred in the perpetration of the felony of kidnaping. No error is assigned with reference to instructions of the court on this or any other matter. We find no error therein.

[6]   It was not error to accept the defendant's plea of guilty of the offense of kidnaping and thus to withdraw that charge, as a separate criminal offense, from the jury's consideration, but had this been error, it would clearly be harmless in view of the defendant's own testimony describing in detail the kidnaping and the events leading in an unbroken chain therefrom to the death of Mrs. Boyd.

[7]   The State's witness Hines identified the defendant in court as the man he saw in Mrs. Boyd's automobile with her as they passed him while he was stopped waiting to make a left turn at an intersection only minutes before her death. In the absence of the jury, the court conducted a voir dire and found the in-court identification of the defendant by this witness was not tainted by any extraneous or unlawful or impermissible suggestion by anyone, or by photographs exhibited to him by the police, to whom this witness gave an accurate description of the defendant prior to him seeing such photographs. The evidence on the voir dire supports the findings of the judge and there was no error in admitting the in-court identification of the defendant by this witness. The defendant virtually so concedes in his brief in view of our decision in *State v. Branch*, 288 N.C. 514, 220 S.E. 2d 495 (1976). Even if there had been error in the admission of this evidence, it pales into insignificance and is clearly harmless in view of the defendant's own testimony describing the kidnaping of Mrs. Boyd, the robbery of the bank and his compelling her to drive from the bank to the place where she was shot. There is no merit in this assignment of error.

On cross-examination of the defendant's stepdaughter, the defendant's counsel attempted to discredit her testimony by showing she had been promised that, in exchange for her testimony, she, herself, would be charged only with aiding and abetting in the kidnaping of Mrs. Boyd. She testified in the course of such cross-examination, "I am not worried about being charged with two other kidnapings and two other murders." She acknowledged that a note exhibited to her by the cross-examining counsel revealed her involvement in the kidnap-murder of two other girls. On redirect examination by the district attorney, she testified that she had made a statement to the officers on the day she was arrested concerning "the other two murders and kidnapings" and directed the officers to places where evidence of those crimes might be found. Her statement concerning these other murders and kidnapings was introduced in evidence. It was to the effect that, in her company, two weeks prior to the kidnaping and killing of Mrs. Boyd, the defendant had kidnaped and murdered two other girls, these crimes being described in substantial detail. The defendant assigns the admission of this evidence on redirect examination as error.

[8, 9] It is, of course, true that, nothing else appearing, the State cannot, through its own witnesses, offer evidence tending to show the defendant has committed another distinct, independent, separate offense having no relation to the crime charged, except its tendency to show his disposition to commit a crime of the nature of the one for which he is on trial. *State v. Carey,* 288 N.C. 254, 218 S.E. 2d 387 (1975) ; *State v. Patterson,* 284 N.C. 190, 200 S.E. 2d 16 (1973) ; *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). However, the nature of the defendant's cross-examination of this witness for the purpose of impeaching her credibility was such as to suggest to the jury that the witness, independent of the defendant, had been involved in other kidnapings and murders. On redirect examination, for the purpose of rebutting this impeaching evidence, the State was entitled to show that the defendant was the kidnaper and murderer on the other occasion. *State v. Patterson, supra.*

Furthermore, the record does not show any objection to this evidence on the redirect examination of the stepdaughter. The failure to object to the introduction of the evidence is a waiver of the defendant's right to do so, and the admission of such evidence, even if incompetent, is not ground for a new

trial. *State v. Hedrick,* 289 N.C. 232, 221 S.E. 2d 350 (1976) ;
*State v. Gurley,* 283 N.C. 541, 196 S.E. 2d 725 (1973) ; *State
v. Howell,* 239 N.C. 78, 79 S.E. 2d 235 (1953).

[10]   The defendant next contends that "the trial court erred
in allowing the testimony of Debra Brown" (the stepdaughter
of the defendant). The basis of this contention is that she testi-
fied on cross-examination by the defendant that she had been
promised, in exchange for her testimony as a witness for the
State, that she, herself, would be charged only with the offense
of aiding and abetting in the kidnaping of Mrs. Boyd and would
not be prosecuted for her murder. The record discloses no mo-
tion to suppress the testimony of this witness and no motion
to strike her testimony, or any objection on the ground of her
competence as a witness. Furthermore, this assignment of error
has no merit for the reason that the witness was competent.
The defendant virtually so concedes in his brief in the light
of our decision in *State v. Woodson,* 287 N.C. 578, 215 S.E. 2d
607 (1975), which clearly so holds.

[11]   The defendant further contends that the trial court erred
in "allowing the jury access to TV and other news sources." The
record shows that when recessing for the night, the court in-
structed the jury not to discuss the case with anyone, not even
among themselves, and directed them: "Please don't listen to
anything about it. If there be anything on the radio or on the
local TV about it, just cut it off until you think that part of
it would be over. Don't read anything about it in the news-
papers. In all due respect to whomever may write the newspaper
or the TV or radio people, you have heard everything that has
happened here. They can't tell you anything that you don't
know from what has developed in this evidence. So just keep
your mind free and open about the case until you have heard
all of the evidence, the arguments of counsel, and the charge
of the court." In this we see no error. The defendant concedes
in his brief that he is unaware of any misconduct on the part
of any juror or any disregard of the instructions of the trial
court. In the absence of any indication to the contrary, the
jurors are presumed to have complied with the instructions of
the court. *State v. Self,* 280 N.C. 665, 187 S.E. 2d 93 (1972) ;
*State v. Moore,* 276 N.C. 142, 171 S.E. 2d 453 (1970). The
record discloses no objection by the defendant to this instruc-
tion or any request for further instruction or action by the
court in this respect.

**[12]** The defendant, acknowledging that we have repeatedly ruled to the contrary, contends that it was error to sentence the defendant to death for the reason that such sentence constitutes cruel and unusual punishment. Further discussion of this contention would be needlessly repetitious of our former decisions. See: *State v. Bush,* 289 N.C. 159, 221 S.E. 2d 333 (1976) ; *State v. Woodson, supra; State v. Jarrette, supra; State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973).

Finally, the defendant in his brief requests us to consider all assignments of error made in his statement of the case on appeal, whether brought forward in the brief or not. We have done so and have also carefully considered the entire record. We find no merit in any assignment of error and no error in the record which would entitle the defendant to a new trial. The record, in its entirety, discloses a carefully planned and coldly executed murder of a young woman, unknown to the defendant, seized and used as a shield or hostage in the bank robbery and, when she was no longer useful to the defendant for that purpose, murdered in cold blood in order to eliminate a witness who could identify him as the robber. The defendant has had a fair trial free from any substantial error.

No error.