STATE OF NORTH CAROLINA v. JAMIE LAMONT SMITH

No. 279A99

(Filed 25 August 2000)

**1. Homicide— first-degree murder— short-form indictment**

The short-form bill of indictment for first-degree murder complies with both the North Carolina and United States Constitutions. N.C.G.S. § 15-144.

**2. Jury— selection—criminal record checks of prospective jurors—equal access**

There was no error in a capital sentencing proceeding where defendant contended that he did not have equal access to the criminal records of prospective jurors following the prosecutor's challenge to a juror whose questionnaire falsely indicated that she had never been charged with a crime. The court suggested that defendant attempt to get such information through the public defender and the prosecutor suggested that the same information was attainable from the clerk's office. Defendant contends that the public defender does not have access to PIN, which is available to the State, and that other mechanisms for obtaining such information are unreasonably onerous and not universally accessible; however, defendant did not ask for discovery of information in the State's possession and the court's action did not constitute error.

**3. Jury— selection—criminal record check—*Batson* challenge**

The prosecutor's challenge to an African-American prospective juror for a capital sentencing proceeding does not appear to have been motivated by purposeful discrimination where a prospective juror stated on her questionnaire that she had no criminal history but a criminal history check by the State revealed that she had been charged and convicted of writing a check on a closed account. Defendant's desire to plumb whether this juror had been treated disparately by being singled out for a criminal record check must be addressed through a Batson challenge because defendant did not request disclosure of whether checks were run on other prospective jurors under the statutes governing discovery.

**4. Jury— selection—capital trial—bias against death pen-
alty—further inquiry—court's discretion**

   The trial court did not err during jury selection for a capital
sentencing proceeding by excusing for cause jurors who
answered affirmatively when asked whether they had beliefs or
opinions against the death penalty which would prevent them
from imposing a death sentence under any facts or circum-
stances. When a prospective juror has unequivocally indicated an
unyielding bias against capital punishment, the goal of assem-
bling an impartial jury is not jeopardized by voir dire that does
not plumb further whether the prospective juror could follow the
law, as in this case. When the bias is less patent and the operative
question is whether that bias is surmountable, the court's discre-
tion is due deference from the reviewing court.

**5. Jury— selection—capital trial—opposition to death pen-
alty—no rehabilitation**

   The trial court did not err during jury selection for a capital
sentencing proceeding by refusing to permit rehabilitation of a
juror who had expressed unequivocal opposition to the death
penalty.

**6. Jury— selection—capital trial—manner in which death
penalty executed—irrelevant**

   The trial court did not err during jury selection for a capital
sentencing proceeding by not informing a prospective juror
about the manner in which executions are carried out in North
Carolina and excusing that juror for cause when he stated that he
could not vote for the death penalty without knowing how it was
to be carried out. The manner of execution is in no way relevant
to the deliberations of the jury or to the ability of a prospective
juror to serve.

**7. Jury— selection—capital trial—questions and answers in
Spanish**

   The trial court did not err by denying a motion for a mistrial
during jury selection for a capital sentencing proceeding where
the prosecutor asked a prospective juror two questions in
Spanish, the juror responded in Spanish, and subsequent
responses in English revealed that the juror's inability to under-
stand English made him unqualified to serve as a juror under
N.C.G.S. § 9-3. Any arguable error in not ordering the minimal
dialogue in Spanish to be translated for the record was without
prejudicial effect, given the wholly proper excusal.

**8. Jury— selection—capital trial—excusal of juror with limited English**

The dismissal of a prospective juror was not impermissibly based upon national origin where it was clear from the transcript that the court's determination was based on the juror's limited ability to communicate in English rather than on his origin. The legislature's purpose in prescribing the mandatory qualifications for citizens who might serve as jurors was to assure that defendants be judged fairly and impartially; in order to do this a juror must have sufficient proficiency in English to enable full comprehension of the testimony and instructions and to fully and effectively participate in the jury's deliberations. Defendant could have challenged the excusal through the Batson procedure to determine whether the prosecutor acted with discriminatory intent.

**9. Jury— selection—capital trial—randomness—use of old noncomputer method**

There was no error in the jury selection procedure for a capital sentencing proceeding where the prosecutor informed the court shortly before jury selection began that there was some question as to the statutory compliance of a new computerized system of summoning prospective jurors and the court ordered the clerk to call jurors by the old method, which satisfied the random selection requirement of N.C.G.S. § 15A-1214(a).

**10. Criminal Law— guilty pleas—required inquiry**

There was no plain error in a capital prosecution for first-degree murder and other crimes in the acceptance of defendant's guilty pleas where the court examined defendant strictly in accordance with statutory requirements; the direct sentencing consequences of defendant's guilty plea to first-degree murder cannot be definitely or immediately gauged by the judge beyond predicting a minimum sentence of life imprisonment without parole and a maximum sentence of death, as this judge did, and the court had no duty to expound on the direct consequences further absent an indication by defendant that he required such instruction or to do more than inquire into whether defendant was satisfied with his attorneys and their explanation of the charges and possible defenses. Finally, contrary to prior practice, provisions governing capital punishment specifically permit any person indicted for a capital offense to plead guilty. N.C.G.S. § 15A-2001.

**11. Evidence— victim impact statement—motion in limine**

The trial court did not abuse its discretion in a capital sentencing proceeding by denying defendant's motion in limine to prohibit victim impact statements. Deciding the motion pretrial was well within the court's discretion and the only statement introduced did no more than describe the emotional or psychological effect of the victim's death on her brother, which was well within the parameters of N.C.G.S. § 15A-833.

**12. Evidence— photographs—prior crime scene and victim—capital sentencing**

The trial court did not err in a capital sentencing proceeding by allowing the introduction of photographs of the victims and the scene of a prior murder and arson where the photographs were used to illustrate the testimony of a fire department member who had investigated the prior crimes and whose testimony was offered in support of the previous violent felony aggravating circumstance. The court may admit any evidence it deems relevant to sentencing and these photographs were not so numerous or egregious as to render the hearing fundamentally unfair.

**13. Sentencing— capital—mitigating circumstances—remorse**

Any error in excluding a psychologist's direct testimony from a capital sentencing hearing was harmless beyond a reasonable doubt where defendant contended that mitigating evidence of remorse was excluded but failed to make an offer of proof, other evidence of defendant's remorse was before the jury, and defendant did not request and the jury thus did not find this circumstance under the catchall mitigating circumstance.

**14. Evidence— cross-examination—statements underlying psychological diagnosis**

There was no error in a capital sentencing proceeding where the prosecutor asked defendant's psychological expert a number of questions about a prior robbery that occurred a year before the murder to which defendant pled guilty where the questioning was apparently directed at discrediting the diagnosis by showing that statements from defendant which formed a partial basis for the diagnosis were untruthful and unreliable. In addition to the contention being baseless, the trial court has considerable leeway and discretion in governing a sentencing proceeding, and defendant did not assert constitutional error at the sentencing proceeding or raise constitutional error on appeal.

STATE v. SMITH

[352 N.C. 531 (2000)]

### 15. Criminal Law— prosecutor's argument—incivility

There was no prejudicial error in a capital sentencing hearing in the prosecutor's treatment of a prospective juror, defense counsel, and defendant's psychological expert where the prosecutor tested the line between zealous advocacy and incivility but her manner and the interjection of arguably irrelevant matters were benign, if overblown. There was ample evidence that would support the jury's judgment as to the nonstatutory mitigating circumstances allegedly affected by the prosecutor's behavior.

### 16. Criminal Law— prosecutor's argument—personal invective—scatological references

There was no prejudicial error in a capital sentencing proceeding from the prosecutor's argument, which contained unnecessary personal invective but was not so egregious as to compel the court to intervene and did not jeopardize the fairness of defendant's sentencing hearing. Scatological references to a witness's testimony are not to be condoned; however, counsel must be allowed wide latitude in hotly contested cases and the evidence was so overwhelming in this case that the remarks were harmless.

### 17. Criminal Law— instructions—character of victim

The trial court did not err in a capital sentencing proceeding by refusing a requested instruction regarding the character of the victim where the instruction was requested to foreclose excessive use of a brother's victim-impact statement in the prosecutor's closing argument. The court stated that it would reconsider the request if such excessive argument occurred and defendant did not object nor repeat the request for the instruction.

### 18. Sentencing— capital—mitigating circumstance—codefendant in another killing receiving life

The trial court did not err in a capital sentencing proceeding by refusing to submit the mitigating circumstance that a codefendant in another killing did not receive a sentence of death or by excluding copies of the codefendant's judgment and commitments. The information was elicited from a witness on cross-examination, and this case is within the rule that an accomplice receiving a lesser sentence is not an extenuating circumstance.

**STATE v. SMITH**

[352 N.C. 531 (2000)]

### 19. Sentencing— capital—aggravating circumstances—not the same evidence

There was no error in a capital sentencing proceeding where defendant advanced arguments concerning aggravating circumstances which allegedly relied upon the same evidence. Although some evidence overlapped by virtue of how and where the crimes occurred, the first three aggravating circumstances involve separate, distinct victims and the fourth is course of conduct, which is a separate circumstance from the crimes that comprise the series.

### 20. Sentencing— capital—International Covenant on Civil and Political Rights

A defendant's treatment in a capital prosecution did not violate provisions of the International Covenant on Civil and Political Rights concerning cruel or degrading treatment or punishment, or arbitrary deprivation of life.

### 21. Sentencing— capital—death sentence proportionate

A sentence of death was not disproportionate where defendant raped his victim, stabbed her more than sixty times, and set fire to her apartment. The evidence amply supported the aggravating circumstances found by the jury, and the case was more similar to cases in which the death penalty was found proportionate than to those where it was found disproportionate.

### 22. Sentencing— capital—death sentence—passion or prejudice

A death sentence was not imposed under the influence of passion or prejudice where defendant contended that the jury's deliberations must have been permeated by emotion from the testimony of the victim's brother, the subtle effect of black on white crime, the parade of victims, photographs of the victim, and the presence at the hearing of maimed victims of another crime for which defendant was convicted. Defendant offered no evidence that the jury was affected by passion or prejudice other than the brother's victim-impact statement, which was singularly restrained under the circumstances.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Downs, J., on 23 April 1998 in Superior Court, Buncombe County, upon defendant's plea of guilty of first-degree murder and a jury's recommendation of a sen-

STATE v. SMITH

[352 N.C. 531 (2000)]

tence of death. On 26 October 1999, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 17 May 2000.

*Michael F. Easley, Attorney General, by William P. Hart, Special Deputy Attorney General, for the State.*

*William F.W. Massengale and Marilyn G. Ozer for defendant-appellant.*

FREEMAN, Justice.

On 1 May 1995 the Buncombe County grand jury indicted defendant in true bills for murder in the first degree, first-degree burglary, robbery with a dangerous weapon, first-degree forcible rape, and first-degree arson. Defendant pled guilty to all charges. A jury recommended a sentence of death for the murder. The judge imposed sentences within the presumptive range authorized by N.C.G.S. §§ 15A-1340.17(c) for each of the lesser felonies, to run consecutively, and imposed a sentence of death for the murder.

The offenses for which defendant was sentenced in this case were committed on 16 January 1995. The victim, Kelli Froemke, a nineteen-year-old college student, lived with her brother and his girlfriend in their apartment in Asheville. In a statement later given to law enforcement officers, defendant said he gained entry to the apartment by asking Kelli, who was alone at the time, if he could use the telephone. Once in the apartment, defendant demanded money at knifepoint, then forced Kelli into her bedroom and raped her. He then stabbed her more than sixty times. Before leaving, defendant set a fire in the bedroom closet to cover up what he had done. He walked away from the apartment, carrying the cordless phone and Kelli's car keys with him. Kelli's brother and his girlfriend returned to the apartment shortly after 10:00 p.m. and found it full of smoke. After alerting a neighbor to call 911, Kelli's brother made his way through the smoke to Kelli's bedroom where he found her body. He pulled her onto a landing where he administered CPR until the fire department arrived.

Defendant was identified by a neighbor as having been seen around the apartment complex where Kelli lived on the night of the crime. He ultimately gave more than one statement to the police, first implicating a friend, then confessing it was his own intention to rob Kelli, whom he saw getting out of her car, for money for cocaine.

When asked about other recent crimes, defendant told officers he had pled guilty to larceny at the Mountain Trace apartment complex. He also implicated himself in a fire at the Grace Apartments. In subsequent statements defendant elaborated: on 11 December 1994 he and a friend went to the Grace Apartments, knocking on doors to see which apartments were occupied, intending to break in. They eventually stole the mail from the apartment mailboxes. Later that night they broke into a Mountain Trace apartment, stole a computer and other items, and attempted to cover up that theft by starting a fire. About a week later they returned to the Grace Apartments and started a second fire with kerosene to cover up their mail theft. This fire resulted in serious injuries and one death: Phillip Cotton, an eighteen-year-old, died of carbon monoxide poisoning. Another resident of the apartments hung out her window until her hands burned, then fell three stories, breaking her neck. A third resident suffered burns so severe her legs had to be amputated. Defendant was subsequently convicted of the crimes committed in these incidents and sentenced to death for the murder of Phillip Cotton.

Physical evidence corroborated defendant's statements, including a videotape of defendant and his companion buying kerosene the morning of the Grace Apartments fire and DNA evidence matching defendant to the spermatozoa found on Kelli's body.

Defendant offered evidence in mitigation, including the testimony of a clinical and forensic psychologist about defendant's mental illness. Others testified about his close relationship with his mother and other family members and how at sixteen or seventeen he had lost interest in school and turned to alcohol and hard drugs.

[1] Defendant first takes issue with the "short-form" bill of indictment, authorized by N.C.G.S. § 15-144, which states the crime charged as "first degree murder." Defendant argues the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment are violated by the indictment's failure to charge in the indictment the elements of the crime or aggravating circumstances as "fact[s] (other than prior conviction) that increase[] the maximum penalty for [the] crime." *Jones v. United States*, 526 U.S. 227, 243 n.6, 143 L. Ed. 2d 311, 326 n.6 (1999), *quoted in Apprendi v. New Jersey*, —— U.S. ——, ——, 147 L. Ed. 2d 435, —— (2000). We have recently decided this issue in *State v. Braxton*, 352 N.C. 158, ——, —— S.E.2d ——, —— (2000). There we noted not only that this Court has consistently held murder indictments based upon N.C.G.S. § 15-144

comply with both the North Carolina and United States Constitutions, *id.*, slip op. at 7, but that the short-form indictment is sufficient to charge murder in the first degree based on any theory set forth in N.C.G.S. § 14-17 and referenced on the indictment, *id.* Moreover, we held that because "[t]he crime of first-degree murder and the accompanying maximum penalty of death, as set forth in N.C.G.S. § 14-17 and North Carolina's capital sentencing statute, are encompassed within the language of the short-form indictment. . . . [N]o additional facts need[] . . . be charged in the indictment" where the defendant, like defendant here, was sentenced to the prescribed maximum punishment for that crime. *Id.*, slip op. at 8.

We reiterate here that indictments based on N.C.G.S. § 15-144, like those charging defendant in this case, comply with both the North Carolina and the United States Constitutions. *See State v. Wallace*, 351 N.C. 481, 528 S.E.2d 326 (2000); *State v. Williams*, 304 N.C. 394, 422, 284 S.E.2d 437, 454 (1981), *cert. denied*, 456 U.S. 932, 72 L. Ed. 2d 450 (1982). Defendant's assignments of error as to this issue are thus without merit.

[2] Defendant next cites numerous instances in which he contends the jury selection process was flawed. First, he complains that he did not have equal access to the criminal records of prospective jurors. This was prompted by the prosecutor's challenging a juror whose questionnaire falsely indicated she had never been charged with a crime. When defense counsel asked for access to the same resources, the court suggested defendant attempt to get such information through the office of the public defender. Defendant notes that the public defender does not have access to the Police Information Network (PIN), which is available to the State, and that other mechanisms for obtaining such information through other databases are unreasonably onerous and not universally accessible. Although one authorized to do so may pay to run PIN checks, those who are indigent cannot. Defendant contends denying equal access in this way violates an indigent defendant's due process rights and his right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 24, and 35 of the North Carolina Constitution.

Defendant did not ask for discovery of information or documents in the State's possession, but rather requested that the same resources from which such information was derived be accessible to him. Thus, categories of information discoverable under N.C.G.S. §§ 15A-903 and -904 and the trial court's discretion to order the dis-

closure of information not otherwise prohibited, *see, e.g., State v. Warren,* 347 N.C. 309, 492 S.E.2d 609 (1997), *cert. denied,* 523 U.S. 1109, 140 L. Ed. 2d 818 (1998), are not implicated here. Rather, the trial court simply suggested an alternative means to the same end. The record reveals the prosecutor suggested the same information was attainable from the clerk's office upstairs in the same building, and defense counsel agreed to check those resources. Counsel did not subsequently object to the trial court's action or move for funds with which the defense could run its own criminal record checks. *See* N.C.G.S. § 7A-450(b) (1999) (State must provide indigent defendant with necessary expenses of representation); *State v. Parks,* 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992) (to receive state-funded expert assistance, indigent defendant must make "particularized showing that . . . there is a reasonable likelihood that it would materially assist him in the preparation of his case"). The court's action here constitutes neither error of procedure nor error of law from which defendant might seek relief on appeal. *See* N.C.G.S. § 15A-1442 (1999).

[3] The State's exercise of a peremptory challenge to excuse this same juror, an African-American, also prompted defendant's next several assignments of error. Defendant objected to the challenge, and the court excused the jury and asked the prosecutor her reason, the second step in the procedure outlined in *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69 (1986), for evaluating whether a prosecutor has used peremptory challenges in violation of the Equal Protection Clause. Briefly, the process requires the defendant to make a *prima facie* showing that the prosecutor has exercised a peremptory challenge on the basis of race. The burden then shifts to the prosecutor to articulate a race-neutral reason for excusing the juror in question. Finally, the court must determine whether the defendant has carried his burden of showing purposeful discrimination. *Id.* at 96-98, 90 L. Ed. 2d at 87-88. Although in this case defendant never actually stated a *prima facie* case of discrimination, the absence of this step was moot once the prosecutor's stated reason and the court's determination had been made. *Hernandez v. New York,* 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991).

Here, the prosecutor's articulated reason for excusing the juror was that she questioned the juror's veracity: the juror had stated on her questionnaire that she had no criminal history, yet a criminal history check revealed she had been charged and convicted of writing a check on a closed account. The court accepted this reason as race-neutral and overruled defendant's objection.

The court did not err in doing so. The prosecutor's challenge does not appear to have been motivated by purposeful discrimination, but appears both race-neutral and otherwise beyond reproach. Even if, as defendant contends, few people who bounce checks regard doing so as criminal behavior, people who are criminally charged with and convicted of doing so are surely more enlightened. And those who take oaths as jurors must know what an oath means.

Defendant subsequently asked the trial court to inquire whether the State had run criminal record checks on any other prospective jurors. The court, seeing no obligation to do so and not being presented with a motion based in law, refused. (Although the court arguably had the inherent authority in the interest of justice to order disclosure by the State of such criminal record checks, *see generally State v. Warren*, 347 N.C. 309, 492 S.E.2d 609, defendant did not request such disclosure under the auspices of statutes governing discovery in criminal cases, N.C.G.S. §§ 15A-903, -904 (1999).) Defendant's desire to plumb whether this juror had been treated disparately in relation to the rest of the pool by being singled out for a criminal record check must be—and was—addressed through the *Batson* analysis. That is, if the prosecutor can articulate a race-neutral reason for challenging the prospective juror and if this reason does not appear to the court to be mere pretext, then that is the end of the inquiry. It should be remembered that the *Batson* analysis "permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Hernandez*, 500 U.S. at 358, 114 L. Ed. 2d at 405. Further delay to pursue an argument for which a basis in fact has not been established or, as in this case, effectively sought is neither in defendant's interest nor in that of the State. We thus overrule defendant's assignments of error on this point.

[4] Defendant also assigns error to the excusal of eleven prospective jurors who were challenged for cause after their affirmative responses to two questions concerning the death penalty. The prosecutor asked each of these prospective jurors, first, whether he or she had "any religious, moral, or philosophical beliefs or opinions against the death penalty." Each answered "yes." The prosecutor then asked: "If the defendant was found guilty of first-degree murder, would your feelings or beliefs about the death penalty prevent you from voting at the sentencing hearing to impose a death sentence under any facts or circumstances and no matter what evidence or aggravating circumstances were shown?" Again, each prospective juror answered defin-

itively, "yes," and was challenged for cause. Defendant now contends that, despite these responses, the inquiry was inadequate to determine whether the prospective juror met the critical standard for challenge for cause under *Wainwright v. Witt*, 469 U.S. 412, 83 L. Ed. 2d 841 (1985). That standard is characterized as beliefs that impede the juror's ability to follow the law—beliefs that " 'prevent or substantially impair the performance of his duties as a juror in accordance with this instruction and his oath.' " *Id.* at 420, 83 L. Ed. 2d at 849 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)); *see also, e.g., State v. Gregory*, 340 N.C. 365, 394, 459 S.E.2d 638, 654 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

Challenge for cause must rest on more than a prospective juror's " 'general objections to the death penalty or expressed conscientious or religious scruples against its infliction.' " *Gregory*, 340 N.C. at 394, 459 S.E.2d at 654 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 785 (1968)). Beyond this rule, however, is the question of precisely what kinds of responses on *voir dire* justify a prospective juror's excusal for opposition to the death penalty. In *Witherspoon* and in *Wainwright v. Witt*, the United States Supreme Court drew and refined two profiles of venirepersons excusable for cause—one distinctive and readily identifiable, the other so much less so that the sentencing court's own discernment is accorded substantial deference. The first kind of prospective juror is one whose opposition to the death penalty is absolute and invariable, regardless of the character of the defendant or the circumstances of the crime. Such candidates "could be excused for cause if they expressed an unmistakable commitment to automatically vote against the death penalty, regardless of the facts and circumstances which might be presented." *State v. Brogden*, 334 N.C. 39, 42, 430 S.E.2d 905, 907-08 (1993) (citing *Witherspoon*, 391 U.S. at 522 n.21, 20 L. Ed. 2d at 785 n.21); *see also Gregory*, 340 N.C. at 388, 459 S.E.2d at 651 (citing *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992)). This description mirrors the prosecutor's inquiry here. We stress that prospective jurors who fit this profile are not those for which the "standards" described in *Witherspoon* and *Wainwright* were drawn. *See Witherspoon*, 391 U.S. at 513-14, 20 L. Ed. 2d at 780 ("The issue before us is a narrow one. It does not involve . . . the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them.").

STATE v. SMITH

[352 N.C. 531 (2000)]

The second kind of prospective juror is one whose opposition is not blinding, who can put aside bias and exercise judgment informed by the law. The Court in *Witherspoon* recognized that such people are suitable as jurors: "A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." *Id.* at 519, 20 L. Ed. 2d at 783, *quoted in Brogden*, 334 N.C. at 42, 430 S.E.2d at 907. In *Adams v. Texas* the Court articulated the rule, reaffirmed in *Wainwright*, that such a prospective juror cannot properly be excused for his views on capital punishment unless those views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 448 U.S. at 45, 65 L. Ed. 2d at 589, *quoted in Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52; *see also Brogden*, 334 N.C. at 42, 430 S.E.2d at 907. It is in fact one objective of jury *voir dire* to determine whether those who oppose the death penalty would nonetheless be suitable as jurors by being capable of and willing to "conscientiously apply the law to the facts adduced at trial." *Wainwright*, 469 U.S. at 421, 83 L. Ed. 2d at 850. "[T]he quest is for jurors who will conscientiously apply the law and find the facts. That is what an 'impartial' jury consists of . . . ." *Id.* at 423, 83 L. Ed. 2d at 851, *quoted in Brogden*, 334 N.C. at 42, 430 S.E.2d at 907.

Determining whether a prospective juror is intractably biased or whether such bias is surmountable through "discretionary judgment" may not always be "unmistakably clear" from the printed record. *Wainwright*, 469 U.S. at 424-26, 83 L. Ed. 2d at 852. "[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 426, 83 L. Ed. 2d at 853, *quoted in Brogden*, 334 N.C. at 43, 430 S.E.2d at 908. "[T]his is why deference must be paid to the trial judge who sees and hears the juror." *Wainwright*, 469 U.S. at 426, 83 L. Ed. 2d at 853. "In such cases, reviewing courts must defer to the trial court's judgment concerning the prospective juror's ability to follow the law impartially." *State v. Davis*, 325 N.C. 607, 624, 386 S.E.2d 418, 426 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990), *quoted in Brogden*, 334 N.C. at 43, 430 S.E.2d at 908; *see also State v. Moses*, 350 N.C. 741, 752-53, 517 S.E.2d 853, 861 (1999), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 826 (2000); *State v. Hill*, 347 N.C. 275, 288, 493 S.E.2d 264, 271 (1997), *cert. denied*, 523 U.S. 1142, 140 L. Ed. 2d 1099 (1998).

STATE v. SMITH

[352 N.C. 531 (2000)]

In this case, all eleven prospective jurors answered the prosecutor's two questions in the affirmative. When prospective jurors' bias against capital punishment is unwavering and unequivocally clear to the sentencing court, then the court may properly conclude that they fit the profile of the first type of venireperson, whose "opposition to capital punishment will not allow them to apply the law or view the facts impartially." *Wainwright*, 469 U.S. at 421, 83 L. Ed. 2d at 850. Thus, for such prospective jurors, it does not matter if the question whether he or she would oppose the death penalty "under any facts or circumstances" is answered "yes," or if the question whether, despite that bias, he or she would be able to follow the court's instructions and the oath, is answered, "no." When the response to either question is unequivocal, the juror must be excused for cause.

Nevertheless, for prospective jurors whose answers on *voir dire* indicate a willingness to put aside such bias and "follow the statutory sentencing scheme and truthfully answer the questions put by the trial judge," *id.* at 422, 83 L. Ed. 2d at 850, "the "proper standard" is one that focuses on the juror's ability to be responsible, reflective, and fair-minded—to follow the law and the juror's oath. It is the better practice, once bias against the death penalty has been identified, to test that bias not merely against unspecified "facts and circumstances," but against the gauge of the juror's willingness to follow the court's instructions on the law and to obey his or her oath. We reiterate, however, the observation of the Court in *Wainwright* that, for this second class of veniremen, "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* at 424, 83 L. Ed. 2d at 852.

> What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.

*Id.* at 424-25, 83 L. Ed. 2d at 852. In such situations the sentencing court's firsthand impression is owed deference. *Id.* at 426, 83 L. Ed. 2d at 852-53.

When a prospective juror has in fact unequivocally indicated an unyielding bias against capital punishment, the goal of assembling an impartial jury is not jeopardized by *voir dire* that does not plumb fur-

ther whether, despite those scruples, the prospective juror could follow the law. But such limited inquiry is appropriate only when the prospective juror's bias *is* "unmistakably clear," as was the case with these eleven members of the venire. When, however, bias is less patent and the operative question is not *whether* the prospective juror is biased but whether that bias is surmountable with discernment and an obedience to the law, the court's decision, in the exercise of its sound discretion and judgment, that such prospective jurors are excusable for cause is due the reviewing court's deference.

**[5]** Defendant also assigns error to the court's refusal to permit rehabilitation of one of these eleven jurors. We held in *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990), that, in order to prevent possible harassment of the prospective juror based on his or her personal views, a defendant may not "rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the [sentencing] court." This rule remains as sound as its reasoning; we overrule this assignment of error.

**[6]** Defendant next contends the court erred in allowing excusal for cause of a prospective juror because the court refused to inform him how executions are carried out in North Carolina, an issue upon which his opposition to the death penalty appeared to hinge. After considerable colloquy, the prospective juror concluded, "Without knowing, in good conscience[,] I could not vote for the death penalty without knowing how it was going to be executed." Defendant contends that, without establishing that the juror would feel the death penalty to be inhumane if he actually knew the manner of its execution, the tenets of *Wainwright* and *Adams* are violated. *E.g., Adams*, 448 U.S. at 50, 65 L. Ed. 2d at 593 ("to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law").

The deliberations and sentencing recommendation of a jury in a capital sentencing proceeding must be based upon the absence or existence and relative weight of aggravating and mitigating circumstances "after hearing the evidence, argument of counsel, and instructions of the court." N.C.G.S. § 15A-2000(b) (1999). The manner of execution is in no way relevant to these deliberations, nor is it in

any way relevant to the ability of a prospective juror to serve. Generally speaking, the court is duty-bound only " 'to explain . . . each essential element of the offense and to apply the law with respect to each element to the evidence bearing thereon.' " *E.g.*, *State v. Avery*, 315 N.C. 1, 36, 337 S.E.2d 786, 803 (1985) (*quoting State v. Mundy*, 265 N.C. 528, 529, 144 S.E.2d 572, 573 (1965). More specifically, it is the court's positive responsibility to eradicate irrelevant matters from the consideration of the jury. "It is the knowledge that irrelevant considerations of a prejudicial nature have entered into the deliberations of the jury, rather than the source of such considerations, that calls the judge to duty." *State v. Conner*, 241 N.C. 468, 472, 85 S.E.2d 584, 587 (1955). Here the court did its duty and did not err.

[7] Defendant next contends that the court erred in not allowing his motion for a mistrial after a prospective juror was asked by the prosecutor and responded to two questions in Spanish. The court thereafter told the prosecutor that she would have to ask in English and that responses in any other language would have to be interpreted for the reporter. After a few more questions (in English), the prosecutor challenged the prospective juror for cause. Defendant says this exchange (in Spanish) was *ex parte* communication between the State and a venireperson in violation of North Carolina rules of court, statutes, and his rights under the North Carolina and United States Constitutions. Absent a translation of what was said, he contends the State cannot show this error was harmless beyond a reasonable doubt.

Untranslated dialogue in a language other than English could be as inaccessible and one-sided as the resulting blank pages of the court record. But under the facts of this case, it is impossible to see how defendant was prejudiced. This prospective juror's subsequent responses reveal that his own inability to understand English made him unqualified to serve as a juror under N.C.G.S. § 9-3 (those qualified to serve as jurors must be able to "hear and understand the English language"):

[PROSECUTOR:] Mr. Adams, I asked you before in English, and I'm going to try one more time in English. Do you understand enough English to pay attention and understand all the witnesses that may come before you in this trial?

MR. ADAMS: Say one more time.

**STATE v. SMITH**

[352 N.C. 531 (2000)]

[PROSECUTOR:] Do you understand enough English to pay attention and understand all the witnesses that may come before you in this trial?

MR. ADAMS: I don't know.

[PROSECUTOR:] Do you not understand the question?

MR. ADAMS: Understand what?

[PROSECUTOR:] The question I just asked. Do you understand the question I just asked you?

MR. ADAMS: A little bit; a little bit. I understand a little bit, but I don't—I don't know.

[PROSECUTOR:] No?

MR. ADAMS: I don't know how to speak too much and speak a little bit.

. . . .

[PROSECUTOR:] Is that true; you can't understand a lot of English?

MR. ADAMS: I understand a little bit.

The court unquestionably acted well within its discretion in allowing the prosecutor's motion to challenge Mr. Adams for cause, and any arguable error in not ordering the minimal dialogue in Spanish to be translated for the record was, given the wholly proper excusal, without prejudicial effect. *See* N.C.G.S. §§ 15A-1442, -1443(a) (1999).

**[8]** Defendant also questions the excusal of Mr. Adams as being impermissibly based on Mr. Adams' national origin and argues that the requirement of N.C.G.S. § 9-3 that jurors must be able to "hear and understand the English language" violates Article I, Section 26 of the North Carolina Constitution (none shall be excluded from jury service on account of national origin); Article I, Section 19 of the North Carolina Constitution (law of the land, equal protection); and similar protections under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

Defendant's position here is untenable on its face. To assume that people native to countries where English is not the mother tongue cannot understand English is as presumptuous and offensive as it is irrational to propose that an inability to understand English is not an

insuperable impediment for a juror. A similar argument was raised in *Hernandez v. New York*, "that Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the Equal Protection Clause to exercise a peremptory challenge on the ground that a Latino potential juror speaks Spanish." 500 U.S. at 360, 114 L. Ed. 2d at 406. The Court in *Hernandez* found it unnecessary to address this argument because the prosecutor stated a race-neutral explanation for the excusal of three bilingual Latinos: their responses and demeanor raised doubts as to their ability to defer to the official translation of Spanish-language testimony. As in *Hernandez*, defendant here should have challenged this excusal through the three-step *Batson* procedure to determine whether the prosecutor acted with discriminatory intent. Even though defendant failed to do so, it is utterly plain from our reading of the transcript in this case that the court's determination that Mr. Adams was not suitable as a juror was not based on where he came from, but on his limited ability to communicate in English. The legislature's purpose in prescribing the mandatory qualifications for citizens who might serve as jurors was to assure that defendants be judged fairly and impartially. *See, e.g.*, *State v. Bryant*, 282 N.C. 92, 191 S.E.2d 745 (1972), *cert. denied*, 410 U.S. 958, 35 L. Ed. 2d 691, *and* 410 U.S. 987, 36 L. Ed. 2d 184 (1973). Clearly, in order to do this, a juror must, at the very least, have sufficient proficiency in the English language as to enable him or her to fully comprehend the testimony and the court's instructions and to fully and effectively participate in the jury's deliberations. It is apparent from the record of *voir dire* that Mr. Adams did not demonstrate this critical level of skill.

[9] Defendant next asserts that a new, computer-generated system of summoning prospective jurors was so questionable that selection of jurors should have been suspended until the system was examined for compliance with the law. N.C.G.S. § 15A-1214(a) requires the clerk to "call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." Shortly before jury selection began, the prosecutor commendably informed the court that the system had previously set up two lists—one random, and one alphabetical—about which there was some question as to compliance with the statute. Because of its concerns with this possibility, the court ordered the clerk to call jurors by the old method of shuffling cards upside down, drawing one at a time and calling each prospective juror at random, thus precluding the clerk's advance knowledge of the identities of those called.

As the old system of calling jurors was utilized here—one which obviously satisfied the random-selection requirement of N.C.G.S. § 15A-1214(a)—we see neither error on the part of the court, although this is what defendant alleges, nor prejudice to defendant. We thus overrule this assignment of error.

**[10]** Defendant pled guilty to all offenses charged, and he now asserts on appeal that the court committed plain error in accepting those pleas without examining defendant's knowledge of the effect of those pleas on sentencing and · on appellate review. Defendant says his responses to the court's inquiry indicated he did not have any idea of the possible consequences of his pleas and that N.C.G.S. § 15A-1022(b), which requires that the judge accept a guilty plea only after determining it to be the product of informed choice, was thus violated. Pertinent parts of their colloquy include the following:

> COURT: The charges that you're facing and indicating that you're pleading "guilty" to, have they been explained to you by your lawyer?
>
> DEFENDANT: Yes, sir, they have.
>
> COURT: Have they—do you understand the nature of the charges?
>
> DEFENDANT: Yes, sir, I do.
>
> COURT: Do you understand the elements of the charges?
>
> DEFENDANT: Yes, sir.
>
> COURT: Have you and your lawyers discussed any possible defenses that you might have had to any or all of these charges?
>
> DEFENDANT: Yes, sir, we have.
>
> COURT: Are you fully satisfied with your lawyers' legal services?
>
> DEFENDANT: Yes, sir, I am.
>
>     . . . .
>
> [The trial court here established defendant's understanding of the possible maximum sentences for the other offenses to which he had pled guilty—first degree burglary, first-degree rape, robbery with a deadly weapon, and first-degree arson.]

COURT: And then first-degree murder is a Class A felony and has a possible—has a maximum punishment of either death by execution or life imprisonment without parole. Do you understand that?

DEFENDANT: Yes, sir.

COURT: Now, do you personally plead guilty to all these offenses?

DEFENDANT: Yes, sir, your Honor, I do.

COURT: Are you in fact guilty of them?

DEFENDANT: Yes, sir, your Honor, I am.

. . . .

COURT: Has anybody made any promises to you or threatened you in any way to cause you to enter this plea against your wishes?

DEFENDANT: No, sir.

COURT: Do you enter the pleas of your own free will, fully understanding what you're doing?

DEFENDANT: Yes, sir.

COURT: Do you have any questions of me about anything I've just said to you or about anything else connected with your cases up to this point in time?

DEFENDANT: No, sir.

The court examined defendant strictly in accordance with statutory requirements that a defendant be apprised not only of the constitutional and statutory rights he waives as a consequence of pleading guilty, but also, as the quoted portions of the dialogue shows, of "the nature of the charge," N.C.G.S. § 15A-1022(a)(2) (1999), and of such direct consequences of the plea as "the maximum possible sentence on the charge for the class of offense for which the defendant is being sentenced, including that possible from consecutive sentences, and . . . the mandatory minimum sentence, if any, on the charge," N.C.G.S. § 15A-1022(a)(6). This latter part of the statute addresses a defendant's due process right that the plea be " 'entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court.' " *Brady v.*

*United States*, 397 U.S. 742, 755, 25 L. Ed. 2d 747, 760 (1970) (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957) (*en banc*), *rev'd on other grounds*, 356 U.S. 26, 2 L. Ed. 2d 579 (1958)).

Defendant contends, however, that the statutory formula for informing a defendant pleading guilty of the maximum and minimum sentences for the offenses of which that defendant is accused, falls short of constitutional requirements for an informed plea to the murder charge. Defendant was not told in particular that, as he was pleading guilty to murder in the first degree based on theories of premeditation and deliberation *and* of felony murder, his pleas to the felonies other than the murder would establish four aggravating circumstances and foreclose the argument of certain issues on appeal.

"Direct consequences" are those that have a "definite, immediate and largely automatic effect on the range of the defendant's punishment." *Cuthrell v. Director, Patuxent Inst.*, 475 F.2d 1364, 1366 (4th Cir.), *cert. denied*, 414 U.S. 1005, 38 L. Ed. 2d 241 (1973), *quoted in Bryant v. Cherry*, 687 F.2d 48, 50 (4th Cir.), *cert. denied*, 459 U.S. 1073, 74 L. Ed. 2d 637 (1982). Nothing is automatic or predictable about how a sentencing jury may weigh these aggravating circumstances or whether countervailing mitigating circumstances will be offered or how they will be weighed. Unlike the sentencing provisions of the Structured Sentencing Act, N.C.G.S. ch. 15A, art. 81B, (1999), the "direct [sentencing] consequences" of defendant's guilty plea to the murder, even on both theories, cannot be definitely or immediately gauged by the judge, beyond predicting a minimum sentence of life imprisonment without parole and a maximum sentence of death, as the court here did.

Defendant relies upon *State v. Barts*, 321 N.C. 170, 176, 362 S.E.2d 235, 238 (1987), in which this Court concluded the defendant adequately understood "the nature of the plea and the possible consequences" after the judge explained to him the theories of (1) premeditation and deliberation and (2) felony murder, upon which the charge of murder in the first degree also rested in that case. In *Barts* further explanation was called for by the defendant's initial response that he did not understand he was pleading guilty based upon both theories. In this case, by contrast, defendant answered positively that he understood the nature of the charges against him and their elements and that he had discussed this and possible defenses he might have with his lawyers. Unlike the defendant's response in *Barts*,

STATE v. SMITH

[352 N.C. 531 (2000)]

defendant here gave no signal to the court of a need to further explain the nature of the charges against him. Defendant was informed of the punishment for each offense to which he was pleading guilty, including the punishment of death for the murder. His responses indicated he was pleading as he did voluntarily, knowingly, and intelligently. *Boykin v. Alabama*, 395 U.S. 238, 23 L. Ed. 2d 274 (1969). The court had no duty to expound on direct consequences further, absent an indication by the defendant that he required such instruction.

Defendant also argues the court failed to ascertain whether defense counsel had in fact instructed defendant as to the particular, direct consequences of his pleas. Again, beyond inquiring whether defendant was satisfied with his attorneys and their explanation of the charges and possible defenses and receiving a positive response; and beyond informing defendant of the mandatory sentences for each charge, as required under the Structured Sentencing provisions, the court was required by neither statute nor Constitution to say more.

On this issue of defendant's plea, defendant also argues that this state should return to the practice before *State v. Watkins*, 283 N.C. 17, 194 S.E.2d 800, *cert. denied*, 414 U.S. 1000, 38 L. Ed. 2d 235 (1973), of not accepting a plea of guilty for an offense that could result in capital punishment. At times prior to our decision in *Watkins*, "[t]he idea that a person should be allowed to decree his own death has been unacceptable, not only to the judiciary, but to the citizens at large." *Id.* at 30, 194 S.E.2d at 809-10. Nevertheless, conflicting policy existed then, as now:

> [A] judge cannot compel a defendant against his will to plead not guilty and submit to a trial; for undoubtedly a prisoner of competent understanding, duly enlightened, has the right to plead guilty instead of denying the charge. Yet, in proportion to the gravity of the offense, the court should exercise caution in receiving this plea, and should see that he is properly advised as to the nature of his act and its consequences. This is a matter which is left largely to the good judgment and discretion of the court, which should be exercised so as to protect a defendant from an improvident plea and to prevent injustice.

*State v. Branner*, 149 N.C. 559, 563, 63 S.E. 169, 171 (1908). Thus, the citizens of this state, through the legislature, have elected a shift in both public policy and the law. Provisions governing capital punishment specifically permit "any person who has been indicted for an

offense punishable by death [to] enter a plea of guilty at any time after his indictment," and the judge is authorized therein to sentence that person to life imprisonment or to death, depending upon the recommendation of a jury convened for that express and limited purpose. N.C.G.S. § 15A-2001 (1999). Unless such provisions are determined to violate the Constitution of this state or of the United States, it is not within this Court's constitutional powers to disregard them and to legislate others. "The courts have absolutely no authority to control or supervise the power vested by the Constitution in the General Assembly as a coordinate branch of the government." *Person v. Board of State Tax Comm'rs*, 184 N.C. 499, 503, 115 S.E. 336, 339 (1922), *quoted in In re Alamance County Court Facils.*, 329 N.C. 84, 95, 405 S.E.2d 125, 130 (1991).

[11] Defendant next argues the court erred in denying his pretrial motion *in limine* to prohibit the introduction of victim impact statements rather than deferring its ruling on the motion until the issue arose or giving the State a limiting instruction. As a consequence, he says, the jury heard inflammatory and prejudicial material.

The fact that the court decided pretrial to permit such statements rather than defer that decision until the State introduced them was well within the court's discretion, and because that decision was interlocutory, it is not appealable. "A ruling on a motion *in limine* is a preliminary or interlocutory decision which the trial court can change if circumstances develop which make it necessary." *State v. Lamb*, 321 N.C. 633, 649, 365 S.E.2d 600, 608 (1988). "[T]hus an objection to an order granting or denying the motion 'is insufficient to preserve for appeal the question of the admissibility of the evidence.' " *T&T Dev. Co. v. Southern Nat'l Bank of S.C.*, 125 N.C. App. 600, 602, 481 S.E.2d 347, 348-49 (quoting *State v. Conaway*, 339 N.C. 487, 521, 453 S.E.2d. 824, 845, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995)), *disc. rev. denied*, 346 N.C. 185, 486 S.E.2d 219 (1997), *quoted in State v. Hayes*, 350 N.C. 79, 80, 511 S.E.2d 302, 303 (1999) (*per curiam*). Nevertheless, because defendant renewed his objection to the victim impact evidence when it was introduced in his sentencing hearing, we proceed to address that specific objection here.

The introduction of victim-impact statements in criminal sentencing hearings in North Carolina is authorized by statute. "A victim has the right to offer admissible evidence of the impact of the crime, which shall be considered by the court or jury in sentencing the defendant. The evidence may include . . . [a] description of the nature

and extent of any physical, psychological, or emotional injury suffered by the victim as a result of the offense committed by the defendant." N.C.G.S. § 15A-833 (1999). So long as victim-impact statements are not so prejudicial as to "render[ ] the hearing fundamentally unfair," no constitutional impediment exists to their use in capital sentencing hearings. *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991).

The only victim-impact statement introduced at defendant's sentencing hearing was the testimony of the victim's brother. The brother, who found his sister's body, stated: "The impact has been, No. 1, that I've lost a confidant[e]. No. 2, that I feel like she was taken from me at a stage in our lives where we needed each other and we were still learning about life, as if a predator had come and taken one of two sibling birds out of the nest." Defendant argues this remark was unduly prejudicial and that the trial court erred in denying his motion to strike.

We disagree. The victim's brother's restrained testimony did no more than describe the emotional or psychological effect of his sister's death on him, well within the parameters of the statute. His statement also followed the guidance by the United States Supreme Court that it address the "specific harm caused by the defendant," *Id.* at 825, 115 L. Ed. 2d at 735, and " 'remind[] the sentencer that . . . the victim is an individual whose death represents a unique loss to society and in particular to his family,' " *id.* (quoting *Booth v. Maryland*, 482 U.S. 496, 517, 96 L. Ed. 2d 440, 457 (1987) (White, J., dissenting), overruled by *Payne*). Nor was this statement so affecting as to sway the sentencing jury to improper considerations in determining defendant's sentence, i.e., to considerations not relevant to the circumstances of the crime or the character of the defendant. *See, e.g., State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). In addition, such "[o]ral testimony . . . relating to punishment" was properly heard in defendant's presence. *State v. Pope*, 257 N.C. 326, 334, 126 S.E.2d 126, 133 (1962). He was "given full opportunity to rebut defamatory and condemnatory matters urged against him, and to give his version of the offense charged, and to introduce any relevant facts in mitigation." *Id.* We hold that the court's decision to allow this statement was well within the wide latitude allowed trial judges in North Carolina in conducting sentencing hearings. *See, e.g., State v. Smith*, 300 N.C. 71, 81, 265 S.E.2d 164, 171 (1980).

**[12]** Defendant also argues publication to the jury of photographs taken of the premises after the Grace Apartments fire and of some of its victims before and after the fire were more prejudicial than probative, and that some, akin to a statement of victim impact, were so prejudicial as to render the sentencing hearing fundamentally unfair. *See Payne*, 501 U.S. 808, 115 L. Ed. 2d 720.

These photographs were introduced to illustrate the testimony of a member of the Asheville Fire Department and Arson Task Force who had been involved in the investigation of the Grace Apartments fire and whose testimony was offered in support of the aggravating circumstance that defendant had been previously convicted of a felony involving the use of violence to a person, N.C.G.S. § 15A-2000(e)(3).

We recently addressed this issue regarding postmortem photographs of the victim of an earlier murder in *State v. Warren*, 347 N.C. 309, 492 S.E.2d 609. We noted that the State may present evidence of the circumstances surrounding a defendant's prior felony, notwithstanding the defendant's stipulation to the record of conviction, to support the existence of aggravating circumstances. *Id.* at 316, 492 S.E.2d at 612; *see also Brown*, 315 N.C. at 61, 337 S.E.2d at 824 (the prosecution "must be permitted to present *any competent, relevant evidence relating to the defendant's* character or *record* which will substantially support the imposition of the death penalty so as to avoid an arbitrary or erratic imposition of the death penalty") (emphasis added). Further, "[i]f the felony of which defendant has previously been convicted was a particularly shocking or heinous crime, the jury should be so informed." *Warren*, 347 N.C. at 316, 492 S.E.2d at 612 (citing *State v. Heatwole*, 344 N.C. 1, 19, 473 S.E.2d 310, 319 (1996)). The court may admit any evidence it deems relevant to sentencing, including photographs of the victim to illustrate the testimony of a witness regarding the manner of a killing. *See id.*; *State v. Kandies*, 342 N.C. 419, 444, 467 S.E.2d 67, 80, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). "Photographs [depicting] the circumstances of the murder, the condition of the body, or the location of the body when found are relevant and admissible at sentencing, even when the victim's identity and the cause of death are not in dispute at trial. This is true even if the photographs are gory or gruesome." *State v. Williams*, 350 N.C. 1, 34, 510 S.E.2d 626, 648, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 162 (1999); *accord State v. Conaway*, 339 N.C. 487, 525, 453 S.E.2d 824, 848, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995).

We conclude that the photographs published to the sentencing jury here were not so numerous or egregious as to render the hearing fundamentally unfair. *Cf. State v. Hennis*, 323 N.C. 279, 287, 372 S.E.2d 523, 528 (1988) (in guilt phase of trial, repetitive showing of macabre slides projected on a screen above defendant's head more prejudicial than probative). Introduced for illustrative purposes, the photographs were the visible consequences of defendant's prior criminal act, relevant to the aggravating circumstance of defendant's prior violent felony. To whatever extent they were heinous or shocking, the jury, whose duty it was to consider the character of the defendant and the circumstances of the crime, was entitled to be informed.

**[13]** During the testimony of defendant's psychological expert, the court sustained the prosecutor's hearsay objections to two questions regarding any expression of defendant's remorse. Defendant now asserts that by doing so the court violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution to place all mitigating evidence before the jury. *See Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978).

"[R]elevant mitigating evidence cannot be excluded at a sentencing hearing based on evidentiary rules." *State v. Adams*, 347 N.C. 48, 63, 490 S.E.2d 220, 227 (1997), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998). As in *Adams*, however, defendant here failed to except to the court's ruling and to make an offer of proof. "An exception to the exclusion of evidence cannot be sustained when the record fails to show what the witness would have testified had he been permitted to answer." *State v. Fletcher*, 279 N.C. 85, 99, 181 S.E.2d 405, 414 (1971), *quoted in Adams*, 347 N.C. at 63, 490 S.E.2d at 227. Moreover, any arguable constitutional violation was harmless beyond a reasonable doubt, for other evidence of defendant's remorse was before the jury. This was in the form of the psychologist's actual written report, which defense counsel moved to introduce and the court allowed into evidence immediately after the psychologist testified. In that report the psychologist had noted:

During discussions when Jamie's mental status was more stable, he admitted significant conflict over his situation despite his grandiose beliefs. He indicated he could not understand his behavior, why or how he did the things that caused his imprisonment. He stated, "I failed my family and the community."

The jury heard this other evidence of defendant's remorse, but the defendant failed to request and the jury thus did not find this cir-

cumstance under the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9) (1999). Under such circumstances, similar to those in *State v. Daughtry*, 340 N.C. 488, 459 S.E.2d 747 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996), we consider any error in excluding the psychologist's direct testimony to have been harmless beyond a reasonable doubt.

**[14]** In her cross-examination of defendant's psychological expert, the prosecutor asked a number of questions about a robbery that occurred in the restaurant where defendant was working the year before the murder in this case and to which defendant subsequently pled guilty as an accessory before the fact. Defendant claimed and hospital records show he suffered a mild concussion in a fall during the robbery. The psychologist opined that defendant's mental faculties were impaired by a psychotic disorder and by cognitive deficits resulting from a concussion occurring about the same time as the fall during the robbery. The prosecutor's examination, which included asking the psychologist whether she was aware defendant had filed a worker's compensation claim for this injury and that he had sued a prison nurse for failing to give him medication for AIDS, which disease he did not have, was apparently directed at discrediting the psychologist's diagnosis by showing that those of defendant's statements upon which it had been based in part were untruthful and unreliable.

Defendant contends on appeal that this examination was so incompetent and grossly prejudicial as to have rendered the sentencing proceeding fundamentally unfair in violation of his due process rights. *See Payne*, 501 U.S. 808, 115 L. Ed. 2d 720. We find this contention baseless in fact. Nevertheless, for the guidance of other criminal appeals to this Court, we point out the following additional reasons we overrule defendant's underlying assignments of error: We reiterate that the court has considerable leeway and discretion in governing the conduct of a sentencing proceeding, to which the North Carolina Rules of Evidence do not apply. *See, e.g., Daughtry*, 340 N.C. at 517, 459 S.E.2d at 762 (any evidence the court " 'deems relevant to sentence' " may be introduced) (quoting N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992)). More fundamentally, however, defendant waived his right to appellate review of this issue because he failed to raise it as constitutional error before the court and to allege the same in his assignments of error. To preserve a question for appellate review, a party

must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party

desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection or motion.

N.C. R. App. P. 10(b)(1). The North Carolina Rules of Appellate Procedure also provide: "Except as otherwise provided herein, the scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal in accordance with this Rule 10." N.C. R. App. P. 10(a); *see also, e.g., State v. Elliott*, 344 N.C. 242, 277, 475 S.E.2d 202, 218 (1996) (defendant failed to preserve issue for appellate review where he failed to object to the court's action, made no motion and thus received no ruling from the court with respect to the constitutionality of the contested issue, and did not assign error to that issue), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997).

Defendant neither asserted constitutional error to the court at the sentencing proceeding nor raised constitutional error as an assignment of error addressing this issue before this Court. Such putative error is thus waived as well as being substantively without merit.

**[15]** Defendant next quotes copiously from the record, detailing numerous instances of the prosecutor's allegedly rude and curt treatment of a prospective juror, defense counsel, and, most particularly, of defendant's psychological expert.

Defendant failed to object to most of the prosecutor's allegedly improper remarks; but even absent objection, it is incumbent upon the trial court to take corrective action when necessary to prevent unfair prejudice. *See State v. Sanderson*, 336 N.C. 1, 12, 442 S.E.2d 33, 40 (1994). This Court has rarely found prosecutorial misconduct in a sentencing hearing to be so egregious as to require a new hearing. In *Sanderson*, however, the prosecutor "insulted, maligned, continually interrupted and bullied" a defense witness and distorted her testimony "on several occasions without provoking curative instructions." 336 N.C. at 15, 442 S.E.2d at 41. Because "[t]he net result may . . . have been a less than complete, or less than accurate, statement of her opinion[,]" we could not in that case "conclude that the prosecutor's improper conduct toward this witness caused no prejudice to defendant." *Id.*

Our scrutiny of dialogue flagged by defendant where the prosecutor tested the line between zealous advocacy and incivility leads us

to caution the bar that it remain vigilant, even sensitive, to that line. A prosecutor's first responsibility is not to win at any cost, but as the government's defender of the truth, to be a just advocate.

"The [prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Id.* at 8, 442 S.E.2d at 38 (quoting *Berger v. United States*, 295 U.S. 78, 88, 79 L. Ed. 2d 1314, 1321 (1935)) (alteration in original).

Nevertheless, the prosecutor's manner and the interjection of arguably irrelevant matters into her cross-examination in this case were benign, if at times overblown, compared to the gross excesses that characterized the prosecutor's misconduct in *Sanderson*. Defendant argues that the prosecutor's behavior here had the prejudicial effect of the jury's failing to find the nonstatutory mitigating circumstances that defendant was under the influence of a mental disturbance, that he was unable to conform his conduct to the requirements of the law, that he had suffered a closed head injury which likely had an impact on his psychological condition, and that he had been diagnosed with psychosis and had a family history of paranoid schizophrenia. But the record contains ample other countervailing evidence that would support the jury's judgment as to these circumstances, other than that elicited by the prosecutor, including many instances of the defendant's inconsistent statements. Because we conclude the prosecutor's manner and remarks were not so egregious as to "provok[e] curative instructions" from the trial court, *Sanderson*, 336 N.C. at 15, 442 S.E.2d at 41, defendant's argument as to their deleterious effect on the jury is meritless.

We find other examples raised in this appeal of the prosecutor's exhibited comments toward a juror, defense counsel, and even the judge, to which defendant failed to object, to be so testy as to

approach disrespect, but likewise harmless. Further, as for those instances when the court sustained defendant's objection, "it is not error for the trial court to fail to give a curative jury instruction after sustaining an objection, when defendant does not request such an instruction." *Williams*, 350 N.C. at 24, 510 S.E.2d at 642.

[16] Defendant also claims similar uncivil excesses mar the prosecutor's closing argument. In the sentencing hearing for a capital trial, counsel is permitted wide latitude in arguments to the jury. *See, e.g., State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979). Counsel may argue the facts in evidence and all reasonable inferences therefrom as well as the relevant law. *See Sanderson*, 336 N.C. at 15, 442 S.E.2d at 42. But they "may not become abusive, inject . . . personal experiences, [or] express . . . personal belief as to the truth or falsity of the evidence." N.C.G.S. § 15A-1230(a) (1999). "The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse *ex mero motu*." *State v. Monk*, 286 N.C. 509, 516, 212 S.E.2d 125, 131 (1975). Argument calling for such intervention is that which "strays so far from the bounds of propriety as to impede defendant's right to a fair trial." *State v. Atkins*, 349 N.C. 62, 84, 505 S.E.2d 97, 111 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999).

Our review of the prosecutor's argument discloses a number of remarks abusing these rules, remarks to which defendant again did not object. But these were neither so gross nor so excessive that we can say the court erred in failing to intervene *ex mero motu*. In her closing argument the prosecutor again drew a bead on defendant's psychologist, analogizing the field of psychology generally and psychologists that testify as experts in particular to animals and their habits.

> The psychologized language of moral evasion is like gold in a mountain waiting to be mined by these people flocking to what they perceive to be the public trough of the criminal justice system. Claudia Coleman reminds you of a little boy in a barn. "With all this manure in here, there must be a pony someplace." There's no pony; just manure.

Later, the prosecutor disdainfully disparaged the psychologist's personal motives for testifying, as well as her expertise:

STATE v. SMITH

[352 N.C. 531 (2000)]

Why did she diagnose him like that? She doesn't want to be out of work. Dr. Sansbury didn't do such a great job, and now a woman. The only person hallucinating in this room was that psychologist.

Offensiveness of the imagery aside, maligning the expert's profession rather than arguing the law, the evidence, and its inferences is not the proper function of closing argument. *See Monk*, 286 N.C. 509, 212 S.E.2d 125 (counsel may argue the facts in evidence and all reasonable inferences therefrom as well as the relevant law). Nor are scatological references to a witness' testimony to be condoned, as "[c]ounsel are at all times to conduct themselves with dignity and propriety". Gen. R. Pract. Super. and Dist. Ct. 12, para. 2, 2000 Ann. R. (N.C.) 10. Nevertheless, we have stated many times that in hotly contested cases counsel must be allowed wide latitude, *see, e.g., id.* at 515, 212 S.E.2d at 131, and we have noted in similar cases that it is not improper to highlight reasons for an expert witness' bias, including his or her fee. *See, e.g., State v. Atkins*, 349 N.C. at 82-83, 505 S.E.2d at 110. Further, in this case the evidence is so overwhelming that such scatological references were harmless.

During cross-examination, the psychologist indicated that she had originally believed defendant had faked the head injury he had allegedly sustained either at his own doing, at the hands of his accomplice in the robbery, or by accident. When she saw the hospital records that noted nurses' observations of unequal pupil reactivity and an actual contusion, the psychologist changed her opinion. The prosecutor challenged her repeatedly about this on cross-examination and in closing characterized the psychologist's testimony as dissembling:

She said, "Yes, I knew he had done that part, too." Why did she do that? How honest is that? There's a saying: False in one, false in all. You can't believe anything she said in her report because she didn't mention to this jury about knowing that he didn't have a head injury and he pled "guilty" to accessory before the fact to robbing Backyard Burgers, and she didn't put that in her report, either.

When vigor in unearthing bias becomes personal insult, all bounds of civility, if not of propriety, have been exceeded. *See State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 346 (1967) (counsel "should refrain from abusive, vituperative, and opprobrious language, or from indulging in invectives" directed at opposing counsel). But in evalu-

ating comments alleged to be such, " 'remarks are to be viewed in the context in which they are made and the overall factual circumstances to which they referred.' " *State v. Bowman*, 349 N.C. 459, 473, 509 S.E.2d 428, 437 (1998) (quoting *State v. Robinson*, 346 N.C. 586, 606, 488 S.E.2d 174, 187 (1997)), *cert. denied*, —— U.S. ——, 144 L. Ed. 2d 802 (1999). The record contained evidence supporting both the prosecutor's and the psychologist's understanding of the actuality of defendant's head injury, and the many past instances of defendant's prevarication confounded that evidence further. In this context, and in view of the occasional nature of the prosecutor's excesses, we find their effect to have been innocuous. That the jury failed to find mitigating circumstances that might arguably otherwise have been supported by the psychologist's testimony, if found credible, was likely not because the balance was tipped unfairly by the prosecutor's rhetoric, but because of the unconvincing nature of the evidence supporting those circumstances. We hold that these remarks, while unnecessary personal invective, were not so egregious as to compel the court to intervene and did not jeopardize the fairness of defendant's sentencing hearing.

**[17]** Defendant argues that the court violated his constitutional rights in refusing to include this instruction in its charge to the jury: "Certain evidence has been introduced in this case regarding the character of Kell[i] Fro[e]mke. You are not to impose or refrain from imposing the death penalty on the basis of any good or bad character of Kell[i] Fro[e]mke that you may find." The proffered instruction was culled from the following language in *State v. Reeves* regarding victim-impact statements:

> While evidence of a victim's character may not by the strictest interpretation be relevant to any given issue, the State should be given some latitude in fleshing out the humanity of the victim so long as it does not go too far. The State should not be permitted to ask for the death sentence because the victim is a "good person," any more than a defendant should be entitled to seek life imprisonment because the victim was someone of "bad character."

337 N.C. 700, 723, 448 S.E.2d 802, 812 (1994), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995). " '[W]hen a request is made for a specific instruction that is supported by the evidence and is a correct statement of the law, the court, although not required to give the requested instruction verbatim, must charge the jury in substantial

**STATE v. SMITH**

[352 N.C. 531 (2000)]

conformity therewith.' " *State v. Wilkinson*, 344 N.C. 198, 231, 474 S.E.2d 375, 393 (1996) (quoting *State v. Holder*, 331 N.C. 462, 474, 418 S.E.2d 197, 203 (1992)).

The record reveals that at the time it was requested, the instruction, while amply supported by evidence of the victim's good character, was offered in order to foreclose excessive use of the victim's brother's victim-impact statement in the prosecutor's closing argument. The court specifically stated that if any such excessive argument did occur, it might reconsider defendant's request. Defendant excepted to this decision. During the prosecutor's closing argument, defense counsel neither objected again on this basis nor repeated its request that the court give the instruction. No evidence of the victim's bad character appears in the record, and from the standpoint of its absence, the court did not err in refusing to give the instruction.

**[18]** Defendant next assigns error to the trial court's refusal to submit the following proposed mitigating circumstance: "Jamie Smith's co-defendant in the Grace Apartment case did not receive a sentence of death." Defendant notes in another assignment of error that this information was elicited by defense counsel in examining a witness. The trial court had overruled the State's objection, and defendant argues the court erred in not permitting certified copies of the co-defendant's judgment and commitments to be admitted into evidence. Defendant acknowledges the rule that the fact an accomplice received a lesser sentence in the case for which defendant is on trial is not an extenuating circumstance.

> It does not reduce the moral culpability of the killing nor make it less deserving of the penalty of death than other first-degree murders. The accomplices' punishment is not an aspect of the defendant's character or record nor a mitigating circumstance of the particular offense. It bears no relevance to these factors . . . .

*State v. Williams*, 305 N.C. 656, 687, 292 S.E.2d 243, 261-62 (citations omitted), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982); *see also State v. Ward*, 338 N.C. 64, 114, 449 S.E.2d 709, 737 (1994), *cert. denied*, 514 U.S. 1134, 131 L. Ed. 2d 1013 (1995). Defendant argues this situation is different because the evidence was already before the jury and codefendant was not a participant in the crime for which defendant was not being sentenced. These points are indeed differences, but differences that make the relevance of such information even more remote, as we have said earlier. That the court, in its discretion, allowed this evidence to come before the jury was arguably

to defendant's benefit; that the court disallowed introduction of documents supporting that evidence was both within its discretion and well within the rationale of the rule stated in *Williams*. Barring the jury's consideration of the admitted evidence as mitigating was also wholly proper. Defendant's assignment of error on this point is therefore overruled.

**[19]** Defendant also advances arguments regarding the nine aggravating circumstances requested by the State, to which he repeatedly objected on grounds that they improperly relied on the same evidence. *See State v. Goodman*, 298 N.C. 1, 29, 257 S.E.2d 569, 587 (1979). Defendant did not ask the court to instruct the jury that the same evidence cannot be used as a basis for finding more than one aggravating circumstance. *See* N.C.P.I.—Crim. 150.10 (optional instruction). In *State v. Hutchins*, we elucidated this rule, holding it is permissible to use the same evidence to support aggravating circumstances when "the inquiry prompted by their submission is directed at distinct aspects of the defendant's character or the crime for which he is to be punished." 303 N.C. 321, 354, 279 S.E.2d 788, 808 (1981). Further, "[a]ggravating circumstances are not considered redundant absent a complete overlap in the evidence supporting them." *State v. Moseley*, 338 N.C. 1, 54, 449 S.E.2d 412, 444 (1994), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995).

The aggravating circumstances submitted with which defendant takes issue concerned the Grace Apartments and Mountain Trace arsons. These were stated to the jury as the following, separate circumstances:

(1) Had the Defendant been previously convicted of another capital felony, to-wit: the First Degree Murder of David Lawrence Phillip Cotton?

. . . .

(2) Had the Defendant been previously convicted of a felony involving the use or threat of violence to the person, to-wit the Attempted First Degree Murder of Erin Conklin?

. . . .

(3) Had the Defendant been previously convicted of a felony involving the use or threat of violence to the person, to-wit the Attempted First Degree Murder of Allison Kafer?

. . . .

(9) Was this murder part of a course of conduct in which the Defendant engaged, and did that course of conduct include the commission by the Defendant of other crimes of violence against other persons, to-wit: First Degree Arson at Mountain Trace Apartments and First Degree Arson at Grace Apartments?

It is readily apparent that although some evidence necessarily over-laps by virtue of how and where the crimes occurred, the first three aggravating circumstances, which name separate, unique victims, depend on distinct evidence. As for the ninth circumstance submit-ted, course of conduct is a separate circumstance from the individual crimes that comprise the series because of what it indicates about the character of the perpetrator—not only was he oblivious to the value of every human life affected by each act of arson, but he engaged in a pattern of robbery and arson that showed a particular callousness of character: Knowing the consequences, he did it again.

We addressed a similar argument in *State v. Smith*, 347 N.C. 453, 496 S.E.2d 357, *cert. denied*, 525 U.S. 845, 142 L. Ed. 2d 91 (1998)—defendant's appeal from his convictions for the Grace Apartments arson and murder. In that case we noted that although the (e)(5) aggravating circumstance, which addressed the defendant's hav-ing committed the murder while engaged in another felony (arson) relied on the same evidence as (e)(10)—that defendant knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person—the latter circumstance

> speaks to a distinct aspect of defendant's character [—] that he not only intended to kill a particular person when he set fire to the apartment building, but that he disregarded the value of every human life in the building by using an accelerant to set the fire in the middle of the night.

*Id.* at 468, 496 S.E.2d at 366.

When the court perceives a possible overlap of evidence supporting more than one aggravating circumstance *and* when the court is requested to instruct the jury that the same evidence cannot be used as a basis for finding more than one aggravating cir-cumstance, it should do so. But because the evidence for each cir-cumstance here was distinct as to the crimes or as to an aspect of defendant's character, the court did not err either in submitting the above circumstances or in choosing not to instruct the jury

that it could not rely on the same evidence to find more than one circumstance.

[20] Defendant next argues that his treatment in this case violated provisions of the International Covenant on Civil and Political Rights, which this country ratified on 8 September 1992. Specifically, defendant says the long delay between sentencing and execution and the conditions in which death row inmates are kept constitute "cruel or degrading treatment or punishment" in violation of article VII of the covenant, and, because of errors briefed on appeal, the death penalty imposed constitutes the arbitrary deprivation of life in violation of article VI, section 1.

We do not dispute that "state law must yield when it is inconsistent with or impairs the policy of [such treaties]." *United States v. Pink*, 315 U.S. 203, 231, 86 L. Ed. 2d 796, 818 (1942). But we cannot see how any defendant's right to appeal errors alleged in his capital case, which necessarily delays his execution, or our own mandate to ascertain on appeal that the death penalty rests firmly on the law and is in no way arbitrary or in any other way "cruel or degrading" violates this treaty's provisions. We overrule this assignment of error.

## PRESERVATION ISSUES

Defendant also raises six additional issues that he concedes this Court has previously considered and decided contrary to his position: (1) the unconstitutionality of the death penalty as arbitrary and in conflict with the constitutional requirement of individualized sentencing, held constitutional in, *e.g.*, *State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990); (2) the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9), as unconstitutionally broad, held constitutional in, e.g., *State v. Stroud*, 345 N.C. 106, 478 S.E.2d 476 (1996), *cert. denied*, 522 U.S. 826, 139 L. Ed. 2d 43 (1997); (3) the court's refusal to allow defendant's motions for individual *voir dire* of prospective jurors, held to be within the discretion of the court in, e.g., *State v. Wilson*, 313 N.C. 516, 330 S.E.2d 450 (1985); (4) the court's refusal to allow *voir dire* of prospective jurors about the concept of life without parole, held to be in compliance with N.C.G.S. § 15A-2002 in, e.g., *State v. Skipper*, 337 N.C. 1, 446 S.E.2d 252 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995), and with the Constitution in, e.g., *State v. Neal*, 346 N.C. 608, 487 S.E.2d 734 (1997), *cert. denied*, 522 U.S. 1125, 140 L. Ed. 2d 131 (1998); (5) the trial court's refusal to

strike the word "recommend" from the jury instructions, held neither improper nor misleading in, e.g., *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808; and, finally, (6) the trial court's refusal to grant defendant's motion for a bill of particulars detailing the aggravating circumstances that would be supported by the evidence, held in *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991), not to be within those entitlements guaranteed a criminal defendant by the United States Constitution.

Defendant urges this Court to reexamine these holdings. We have considered defendant's arguments on these issues, and, finding no compelling reason to depart from our prior holdings, we overrule these assignments of error.

## PROPORTIONALITY REVIEW

[21] Defendant asserts the death sentence imposed in this case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Quoting N.C.G.S. § 15A-2000(d)(2). We disagree.

We note at the outset that this Court determined the death sentence imposed for defendant's conviction of murdering Phillip Cotton at the Grace Apartments was neither excessive nor disproportionate. *Smith*, 347 N.C. 453, 496 S.E.2d 357. In this case, the same defendant committed murder under even more awful circumstances, first raping, then stabbing his victim more than sixty times before setting fire to her apartment. The jury found nine aggravating circumstances. It found that defendant had been previously convicted of a felony involving the threat of violence to a person, with regard to (i) the attempted murder of Erin Conklin and (ii) the attempted murder of Allison Kafer, N.C.G.S. § 15A-2000(e)(3); that the murder was committed while defendant was engaged in (i) first-degree rape, (ii) first-degree burglary, (iii) armed robbery, and (iv) first-degree arson, N.C.G.S. § 15A-2000(e)(5); and that the murder was part of a course of conduct in which defendant committed crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). In addition, and most significantly, the jury found that the defendant had been previously convicted of a capital felony, the murder of David Lawrence Phillip Cotton, N.C.G.S. § 15A-2000(e)(2); and that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). As the record discloses, the evidence before the jury amply supported its finding these circumstances. One or more jurors found only one of the four statutory mitigating circumstances submitted by the defendant to

exist and have mitigating value, that defendant had aided in the apprehension of another capital felon, N.C.G.S. § 15A-2000(f)(8); one or more jurors found six of sixteen submitted nonstatutory mitigating circumstances to exist and have mitigating value; and the jurors declined to find any other mitigating circumstances under the catchall, N.C.G.S. § 15A-2000(f)(9).

We have compared this case to others in the pool defined for proportionality review in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995), and in particular to cases in the pool that "are roughly similar with regard to the crime and the defendant," *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). None, however, is more similar or illuminating for purposes of proportionality review than *State v. Smith*, 347 N.C. 453, 496 S.E.2d 357. In that case we concluded, after comparing it to similar cases in the pool, that it bore no affinity with the seven cases this Court has found to be disproportionate, *id.* at 472, 496 S.E.2d at 368. We concluded as well that it was "more similar to cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or those in which juries have consistently returned recommendations of life imprisonment." *Id.* at 473, 496 S.E.2d at 369.

Because the murder in this case, committed by the same defendant, is by its facts and by the jury's findings underlying its recommendation of punishment, even more appalling than that for which defendant was convicted and condemned in *Smith*, it necessarily bears even less similarity to the cases we have found disproportionate and even more to those in which we have found the sentence of death to be proportionate. In *Smith* the jury found all five aggravating circumstances submitted:

(1) that defendant had been previously convicted of a felony involving the threat of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) that defendant committed this murder for the purpose of avoiding lawful arrest, N.C.G.S. § 15A-2000(e)(4); (3) that defendant committed this murder while engaged in first-degree arson, N.C.G.S. § 15A-2000(e)(5); (4) that defendant knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the

lives of more than one person, N.C.G.S. § 15A-2000(e)(10); and (5) that the murder was part of a course of conduct in which defendant committed crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11).

347 N.C. at 472, 496 S.E.2d at 368. In this case the jury found many of the same aggravating circumstances, some more than once, and several in addition, including that this murder was especially heinous, atrocious, or cruel, and defendant's prior conviction of a capital felony.

With all other cases in the proportionality pool in mind, including *State v. Smith*, we hold that the jury recommending punishment for defendant for the crimes committed here was not "aberrant," *see, e.g., State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988), nor was its recommendation "capricious, or random," *see, e.g., State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980).

We repeat, as we did in *State v. Smith*, "[s]imilarity 'merely serves as an initial point of inquiry' " in proportionality review, *Smith*, 347 N.C. at 473, 496 S.E.2d at 369 (quoting *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995)). Whether the death penalty in a particular case is proportionate ultimately rests " 'on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances.' " *Id.* (quoting *Daniels*, 337 N.C. at 287, 446 S.E.2d at 325). In light of that judgment we conclude as a matter of law that the sentence of death in this case was neither excessive nor disproportionate.

[22] Defendant raises as a separate assignment of error the contention that the sentence of death in this case was imposed under the influence of passion and prejudice and that it is this Court's statutory duty to so find and to overturn that sentence and impose the sentence of life imprisonment. *See* N.C.G.S. § 15A-2000(d)(2). The jury's deliberations, he charges, "must have been permeated" with emotion from the "impassioned" testimony of the victim's brother, as well as from the subtle effect of "black on white" crime and the "parade" of victims, from photographs of Kelli Froemke to the presence at his sentencing hearing of the maimed victims of the Grace Apartments fire.

Apart from the "victim-impact statement" made by the victim's brother, which we find singularly restrained, given the blows this young man felt, first in discovering his murdered sister, then in grieving for her loss, defendant offers no evidence that the jury was affected by passion or prejudice in rendering its sentencing recommendation, or that any aspect of the sentencing hearing itself was so infected. Our review of the record also reveals no such excesses. We thus overrule this assignment of error.

We conclude that defendant received a fair capital sentencing proceeding, free of prejudicial error, and that the judgment of death recommended by the jury and entered by the court for defendant's plea of guilty to murder in the first degree, as well as the sentences imposed for first-degree burglary, robbery with a dangerous weapon, first-degree forcible rape, and first-degree arson, should be left undisturbed.

NO ERROR.